UNITED STATES of America,
Plaintiff-Appellee,

v.

Carl Lutz WIESCHENBERG and Carl John Heiser, III,
Defendants-Appellants.

No. 78–5218.

United States Court of Appeals, Fifth Circuit.

Oct. 9, 1979.

---

Paul G. Marshall, Robert W. Cinque, James P. Cinque, Marshall, Morris, Powell, Silfen & Cinque, New York City, for Wieschenberg.

Steadman S. Stahl, Jr., Hollywood, Fla., for Heiser.

James L. Whitten, Asst. U. S. Atty., Miami, Fla., Robert D. Sharp, Internal Security Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before WISDOM, GOLDBERG and VANCE, Circuit Judges.

VANCE, Circuit Judge:

On July 26, 1977, Carl John Heiser, III, and Carl Lutz Wieschenberg were charged in a four-count indictment with acting as agents of the Union of Soviet Socialist Republics and the German Democratic Republic without prior notification to the Secretary of State of the United States in violation of 18 U.S.C. § 951 (Counts I and II respectively) and with acting as agents of a foreign principal without having registered with the Attorney General in violation of 22 U.S.C. §§ 612, 618 (Counts III and IV respectively).

The first indictment was superseded on September 23, 1977, by a new indictment naming Carl John Heiser, III, Carl Lutz Wieschenberg, and Manfred Hardt.[1] The new Counts I and II were identical to Counts I and II of the original indictment. Count III charged Hardt, Heiser and Wieschenberg with conspiring to violate 22 U.S.C. § 1934(c), its successor statute, 22 U.S.C. § 2778(c) and regulations promulgated thereunder, 22 C.F.R. §§ 123.01, 127.01, by willfully, knowingly and unlawfully conspiring to export from the United States to a foreign country a quantity of Litton Industries Inertial Navigation Devices, LTN–51s, an article designated on the United States Munitions List, 22 C.F.R. § 121.01, Category VIII(1), without first having obtained an export license or written approval from the United States Department of State as required by 22 C.F.R. § 123.01.

Count IV charged that Heiser and Wieschenberg conspired to violate 50 U.S.C. App. § 2405(b) and regulations promulgated thereunder, 15 C.F.R. §§ 370.3(a), 377.1(a) and 387.6, by unlawfully, willfully and knowingly conspiring to export from the United States to the Union of Soviet Socialist Republics, various technical data on a 100-megabyte drive storage system computer manufactured by Memorex Corporation, without having first obtained authorization for the export from the Office of Export Administration of the Department of Commerce as required by the Export Administration Act of 1969, 50 U.S.C. App. § 2401, *et seq.*, and a regulation promulgated thereunder.

An arrest warrant was issued for Hardt, a West German citizen, but apparently no attempt to extradite him from West Germany was ever made. Heiser and Wieschenberg pleaded not guilty to all charges. Wieschenberg waived a trial by jury, but the government demanded a jury trial.[2] The jury found Wieschenberg guilty as to Counts II and III and Heiser guilty on Count III. Both defendants moved for judgments of acquittal or for a new trial. Their motion was denied as to Count III, but the court granted Wieschenberg a new trial on Count II and subsequently dismissed that count. Consequently, Wieschenberg and Heiser stand convicted only under Count III. They now appeal that conviction.

*The Demise of the Big "Spy Case"*

The arrest of Wieschenberg and Heiser at the Fort Lauderdale Airport on July 20, 1977, culminated a fifteen-month investigation by federal authorities. It also set the stage for a lengthy trial most notable for its spectacular characterization as the "Mis-

---

1. Wieschenberg urges that the inclusion of Hardt in the last minute indictment was intended to prevent him from deposing Hardt and that this together with the last minute indictment denied him a fair trial. Because we reverse on the sufficiency of the evidence we need not consider this or any of the other issues raised by defendants.

2. Wieschenberg urges that this demand by the government was unduly prejudicial and denied him a fair trial.

sile Spy Case," and its extravagant front-page press coverage.[3]

Heiser and Wieschenberg first met in 1975. During the period from 1975 until their arrest, they engaged in profitable business dealings that included the exchange of I.B.M. tapes, I.B.M. microfisch equipment and I.B.M. manuals and programs. During this period, the appellants discussed other potential business deals and, in connection with these other deals, conducted several meetings with various individuals. Their deals generally involved exportation of technical equipment that had a high profit potential. The government's evidence suggests that appellants were at least willing to cut a few corners in seeking to realize that potential.

Trial and pretrial publicity was quite substantial. Apparently anticipating general community disapproval of activities involving an eastern bloc country, the government cast this as the "Spy Case" and presented it accordingly. Its evidence falls short of supporting that characterization.

Count III, the only count with which we are concerned, charges only the attempted exportation of the LTN–51s in violation of the laws of the United States. The LTN–51 is not a defense secret; it is used extensively outside the United States. With proper authorization from the State Department LTN–51s can be sold freely to eastern bloc countries. As this case demonstrates, the government objects to its exportation to these countries unless it is installed in an airplane. The reason for the distinction does not appear in the record and need not concern us. Whatever the underlying policy, the statute and regulations must be obeyed. We will treat this case, however, as it should have been treated below, as a routine conspiracy case.

The convictions under Count III stem from an alleged conspiratorial agreement between Wieschenberg, Heiser and Hardt to obtain and export the LTN–51 naviga-

tional device without a permit. The 3500-page record and over 600 exhibits, however, deal primarily with Counts I, II and IV and have very little to do with the alleged conspiratorial agreement in Count III. Our task is to seek a kernel of wheat from this veritable mountain of chaff.

### The LTN–51 Deal

In March or April 1976, Mr. Hardt, the owner of Carament Company, a West German electronics firm, met with Mr. Will of the Aero Leasing Company in Munich, West Germany, and discussed the possible purchase of LTN–51s. Through a friend, Mr. Will contacted Litton Industries and obtained a quotation for the LTN–51s to be received by Aero Leasing. At that time Mr. Will told Mr. Hardt that an export license was needed to deliver the LTN–51s outside the United States. Shortly afterward, an associate of Mr. Will received a telex from Litton Industries and forwarded the message to Mr. Hardt. The telex contained information about the restrictions on the LTN–51s [4] including the necessity of an export license complete with the name of the end user. A final meeting, held between Will and Hardt in early June, concluded in their voluntary abandonment of the venture.

At about this time, Heiser began having conversations with Albert Behar, an informant for the F.B.I. The discussions centered around the potential sale of LTN–51s. In the latter part of July 1976 Heiser planned a trip to Washington to meet with a source who would help him obtain the LTN–51s. Heiser then contacted Lloyd Williams, also an F.B.I. informant, through Williams' attorney. Around the middle of August 1976, Heiser and Williams met in Boca Raton, Florida, to explore prospective business opportunities. During this meeting Heiser and Williams discussed the potential LTN–51 transaction. Williams' contacts and his potential for obtaining the

---

3. Wieschenberg argues that pretrial publicity denied him a fair trial. He also claims that the government insisted on a trial by jury to capitalize on the pretrial publicity.

4. Included in the restrictions for exporting the LTN–51 is the requirement that Litton personnel must perform all maintenance and repair work on the devices.

LTN–51s and the required export license were specifically mentioned.

Heiser, Williams, and Wieschenberg met in Freeport, Bahamas at the end of August. During this meeting ·the three men discussed the available LTN–51 opportunity. They later arranged a trip to Germany to meet with Wieschenberg's associates.

On September 10, 1976, Wieschenberg, Heiser and Williams went to the Carament Company in Wiesbaden, Germany, where they were introduced to Manfred Hardt and Eckheard Voss. During this meeting several deals were discussed including the one that involved the LTN–51s. Williams informed the parties that the LTN–51s required an export license and an end user approved by both Litton Industries and the State Department. In response, Hardt disclosed that his end user was in the Soviet Union and that he had been turned down by the State Department in his previous attempts to obtain LTN–51s for export to Russia. Hardt informed Williams that the end user could not be supplied; however, Williams would still be paid thirty percent commission if he could arrange a LTN–51 deal. The meeting in Wiesbaden ended in confusion. No deal had been consummated, no price had been determined, and no end user had been supplied. Williams returned to the United States after a short stop in Paris, France, while Heiser and Wieschenberg went to East Germany.

The LTN–51s were the subject of several meetings and conversations during the next two and one-half months. Heiser, who had visited the Russian Embassy in East Germany, expressed the Russians' interest in the deal, but Williams was unable to conclude the transaction. On November 19, Williams provided the serial numbers of some used LTN–51s to Heiser who indicated that he would relay the numbers to Hardt.

The transaction broke down immediately, apparently because the used Litton gyroscopes were not satisfactory and the Rus-sians were unhappy about dealing with Williams.

The government submits that there is substantial evidence of a conspiratorial agreement between Heiser, Wieschenberg, Hardt and unknown Russian officials to export the LTN–51s out of the United States without the proper export license. Heiser and Wieschenberg urge that an agreement was never reached and that the government failed to prove that they had the requisite specific intent to violate this statute.[5]

We conclude that the evidence is insufficient to support the convictions, but for a slightly different reason than the one urged by Heiser and Wieschenberg.

### The Review Standard

■ We must, of course, sustain the verdict if substantial evidence, taking the view most favorable to the government, supports it. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Our consideration is also governed by the rule that all reasonable inferences and credibility choices must be made in favor of the jury verdict. *See United States v. Black*, 497 F.2d 1039 (5th Cir. 1974).

■ In the district court the test on defendants' motion for judgment of acquittal was whether, taking the view most favorable to the government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion that defendants were guilty beyond a reasonable doubt. *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). In determining the sufficiency of either direct or circumstantial evidence, the test is not whether the evidence excludes every reasonable hypothesis other than that of guilt, but whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of innocence. *See United States v. Fredericks*, 586 F.2d

---

5. We do not emphasize the issues concerning lack of agreement or lack of specific intent because we find that the government's proof of an illegal objective and an overt act in furtherance of that illegal objective is fatally deficient.

470, 474 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Black,* 497 F.2d at 1041.

■ For a conviction of conspiracy, there must be proof of (1) an agreement between two or more persons, (2) an unlawful purpose, and (3) an overt act committed by one of the coconspirators in furtherance of the conspiracy. The government must prove each element. *United States v. White,* 569 F.2d 263 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978).

■■ In addition, "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola,* 420 U.S. 671, 686, 95 S.Ct. 1255, 1265, 43˙ L.Ed.2d 541 (1975). The statute defining the substantive offense, 22 U.S.C. § 1934(c), and its successor statute, 22 U.S.C. § 2778(c), provide,

(c) Any person who *willfully* violates any provision of this section . . . .

22 U.S.C. § 2778(c) (emphasis added). We have clearly held that section 1934(c) requires specific intent. *United States v. Davis,* 583 F.2d 190 (5th Cir. 1978). Therefore, to sustain a conviction on a charge of conspiracy to violate section 1934(c) the government must prove that the defendants agreed to and specifically intended to export without a license particular property that is restricted by the Munitions List.[6]

The jury did not have to rely solely on inferences or circumstantial proof as is frequently the case, in determining what went on within the alleged conspiracy. Government informants were inside it from the outset and gave specific testimony as to what took place. The circumstances in this case also differ markedly from a situation in which the single object of an agreement or combination is illegal. The questioned conduct in this case could be either legal or illegal. The government now concedes that, in their initial discussions about exporting the LTN–51s, the defendants contemplated obtaining an export license. During these early stages, defendants were engaging in a legitimate business in a legal manner, not forming a criminal conspiracy. The proof adduced, which we must measure by the standard of *United States v. Warner,* must be proof of an agreement to depart from that legal course and proof of an overt act in furtherance of the illegal, not the legal, objective.

Defendants are entitled to certain protections before they may be convicted of conspiracy in an undertaking involving both legal and illegal activity. *United States v. Spock,* 416 F.2d 165 (1st Cir. 1969). This principle was recognized in a different setting in *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). The question in *Scales* was whether convicting active members of the Communist Party would interfere with the freedom of inactive or legal members. Speaking for the court Mr. Justice Harlan observed that, because they have mixed motives, such groups are not a "technical conspiracy" and recognized the impropriety of a "blanket prohibition of association with a group having both legal and illegal aims." 367 U.S. at 229, 81 S.Ct. at 1486.

■ We begin with the premise that all conspiracy law is directed only at persons who have intentionally agreed to further an illegal object.[7] To convict, the government

---

**6.** Any reference to former 22 U.S.C. § 1934 is deemed reference to 22 U.S.C. § 2778. *See United States v. Cahalane,* 560 F.2d 601, 606 (3d Cir. 1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978). Accordingly, in light of the holding in *United States v. Davis,* to support a conviction under § 2778 the government must prove specific intent.

**7.** Justice Harlan noted in *Scales,* 367 U.S. at 229, 81 S.Ct. at 1486, that a technical conspiracy "is defined by its criminal purpose." *See United States v. Borelli,* 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.), *aff'd,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Peoni,* 100 F.2d 401, 403 (2d Cir. 1938); Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 925–927 (1959).

must prove that there was an agreement to accomplish an illegal act. It is not enough for it merely to establish a climate of activity that reeks of something foul. The law requires proof that the members of the conspiracy knowingly and intentionally sought to advance an illegal objective. Involvement by individuals in a clandestine agreement that appears suspicious may be ill advised or even morally reprehensible, but, without proof of an illegal aim, it is not criminal. "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975).

### *When Did the Illegal Conspiracy Begin?*

To meet its burden on the critical issues the government relies on inference alone. We were originally asked to infer that, because a license to export LTN–51s to Russia had been denied to Hardt's previous associate, Heiser, Wieschenberg and Hardt must have conspired to export the device illegally. We were referred to the time sequence of the breakdown of the Hardt and Will deal and to the commencement of the association between Heiser and Behar. The government initially contended that the discussions between Heiser and Behar concerning the Russians' desire to obtain 40 LTN–51s, Heiser's statement that he was going to Washington to meet a source who would help him get the LTN–51s and the discussions concerning delivery of payment through two foreign countries were enough to demonstrate an ongoing conspiracy to obtain the LTN–51s and to export them without a license. This evidence, however, is as consistent with a plan to export with a license, a legal act, as it is with exportation without a license, an illegal act.

The government attempted to bolster its position with evidence of the meeting between Heiser, Wieschenberg and Williams in Freeport, Bahamas, on August 28, 1976. It admits, however, that an export license was not discussed. Again, this evidence no more implied that this association had an illegal purpose than that it had a legal purpose.

A serious obstacle to the government's case is provided by its key informant, Williams, whose testimony discloses that one of his principal responsibilities in the exportation scheme was obtaining the required license. Another government informant, Day, testified that he met with Heiser and Wieschenberg during the late summer of 1976 at the Fort Lauderdale airport:

Q. Okay. Now, in other words, it was export-import regulations material, materials that Mr. Weischenberg and Mr. Heiser had?

A. That is correct.

Q. And they discussed the exporting and importation regulations as it pertains to this country, didn't they?

A. Well, I would say there Mr. Weischenberg was doing the talking and when Carl would look away he would talk to me and he was trying to meke [sic] clear to us that these were the regulations that had to be followed not only with this country but all over the world that dealt with all kinds of regulations.

Q. And Mr. Weischenberg did not want to participate in the exportation of anything from this country unless it complied with those regulations, isn't that what he was telling you and Mr. Heiser?

A. I had the impression that he was telling us these are the rules you have to conform to in the import/export business.

Q. Did he tell Heiser that is what he wanted to be sure that Heiser complied with before he sent anything out of this country?

A. He didn't say those words but I had the impression that he was making that clear that there were regulations and laws regarding export.

Q. That had to be complied with?

A. That was my feeling.

Q. When they discussed the Litton navigational gyro equipment, was there any conversation that there were certain regulations about the exportation of this item from this country?

A. Well, Carl Heiser told me that he had turned the matter over to another fellow

that he was dealing with called, named Lloyd Williams.

To this point, at least, the government's testimony not only fails to show a criminal purpose, it clearly indicates that, if there was an agreement to do anything, it was to export the LTN–51s in compliance with the export regulations.

The next meeting occurred at Wiesbaden on September 10, 1976, where the export license requirement was discussed in detail. During Williams' testimony about the conferences that were held at Wiesbaden, he was asked the following:

Q. At either meeting, either at the luncheon or at the meeting at the Caramant Corporation, did you discuss obtaining an export license for the LTN–51?

He answered,

A. I told Mr. Hardt that I was attempting to obtain one [a license] . . . .

During oral argument counsel for the government wisely retreated from its untenable, initial position and instead maintained that although the agreement may have had a legal objective when it was first made, after Hardt refused to supply the name of an end user at the Wiesbaden meeting, defendants may be inferred to have agreed to export the LTN–51s without the required license. The prosecution's revised theory necessitates close examination of the evidence on events that took place following the Wiesbaden meeting.

### After Wiesbaden

On September 20, 1976, Williams and Heiser discussed the LTN–51 transaction by telephone. The export license was not mentioned, but Williams informed Heiser that he was having problems with the deal. The government urges that this evidence indicates that Williams was having trouble getting the gyroscopes out of the country without an export license. The evidence can also be interpreted as showing that Williams was having trouble reaching an agreement on price or obtaining the export license without an end user. Either of the latter theories is consistent with innocence.

The government relies heavily on a meeting between Heiser, Williams and Wieschenberg that took place on October 8, 1976, at the Fort Lauderdale Airport. At that meeting, the three men discussed at great length the problems they were having arranging the LTN–51 transaction. The difficulty seems to have revolved around the quoted price of the gyroscopes. Although the possibility of exporting the LTN–51s without a license appears to have been mentioned, the record shows nothing more concrete than idle conversation and does not intimate that Heiser, Wieschenberg and Williams had abandoned their attempt to obtain an export license.

Heiser and Williams met again on October 9 at Heiser's apartment in Boca Raton. During this meeting Heiser described his visit to the Russian Embassy, explained that the Russian Minister was curious about the state of the LTN–51 negotiations, and informed Williams that the Russians wished to have him investigated. None of this testimony, however, concerns the export license.

On November 17, 1976, Williams informed Heiser by telephone that he could obtain the used LTN–51s. The two men then prepared a telex to be sent to Hardt. The export license was not discussed.

During the following day Williams received a return telex from Hardt in which he expressed interest in the used gyroscopes. Williams contacted Heiser, and Heiser told him that Wieschenberg had spoken with Hardt and that Hardt needed to be given the cost and serial numbers of the used LTN–51s.

On November 19 Williams gave Heiser the requested serial numbers.

The sequence of events on the 17th, 18th and 19th of November does not support an inference that the parties were preparing to export the LTN–51s with or without a license. These discussions reveal only that the Russians were still interested and that Hardt, Heiser, Wieschenberg and Williams were still attempting to consummate a sale. There is no testimony, however, from which a reasonable jury could conclude that they

were not planning to obtain an export license.

An additional conversation between Heiser and Williams took place on December 20, 1976, but the jury could not infer the requisite element of intent to export without a license from the evidence of this conversation.

The testimony of the government's informant, Day, with regard to the export license illustrates the deficiencies of its proof:

Q. At any time, was there any discussion between you and Mr. Heiser or Mr. Weischenberg that the Litton navigational instrument would be shipped out of the country without a license or without permission from the State Department?

A. No.

Ironically the strongest support for the government's contention is supplied by the defense's cross-examination of Williams:

Q. And you testified here to the prosecutor's questions that after the conversation in Mr. Hardt's office where it was left to you to arrange to transport the equipment from the United States to Switzerland and the matter of the license and permission from the State Department was never mentioned again by anyone, is that correct?

A. Well, it was mentioned every time it was brought up and the fact that I couldn't obtain this in trying to determine other ways to get it out of the country.

Q. Tell me specifically who you talked to about other means of tetting [sic] it out of the country. When?

A. I talked with Mr. Heiser.

Q. When, sir?

A. I talked with Mr. Heiser on every conversation that I would have with him with regard to the LTN–51's. To be very specific, it was a main course of conversation that [sic] the October 8th meeting between Mr. Weischenberg, Mr. Heiser and myself.

Q. And that is when it was suggested using this Kuehne-Nagel shipping line?

A. Well, it was never really suggested. It was just given as an example to me of a company that carries freight to West Germany. It was never a link to how, in fact, I could use that airline to circumvent any laws, no, sir.

Q. Right. And Mr. Heiser never asked you to circumvent any laws in connection with the exportation of this equipment from this country specifically, did he?

A. Well, he didn't use those exact words, no, sir.

Q. Pardon me?

A. He didn't use those exact words, circumvent the law to export the product, no, sir.

. . . . .

Q. Did Mr. Heiser—answer this yes or no—did Mr. Heiser ever seek to have the Litton Industries inertial navigational devices exported from this country without an export license?

A. Did he seek from whom, sir?

Q. Did he seek, to your knowledge—

A. Yes, sir.

Q. —from your conversations or what you know of your own knowledge?

A. Right.

Q. Did he seek to obtain the exportation of this equipment out of the continental United States to another country, the Litton Industries inertial navigational devices without an export license?

A. Only through me. I have no knowledge of any other attempt by Mr. Heiser.

Q. Only through you?

A. Yes, sir.

Q. And you have already answered that question that he never directly came out and asked you to do it, did he?

A. No, sir, *he never asked me to do it. We just discussed how we possibly could do it.* [Emphasis added.]

■ The gist of a conspiracy is an agreement to commit an offense. *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940). However slight or circumstantial the evidence may be, it must,

in order to be sufficient to warrant affirmance, prove that the defendants knowingly entered into some form of agreement, formal or informal, and that they had the specific intent to export the LTN–51s without a license.

■ The government must also prove that one of the conspirators performed an overt act in furtherance of the agreement's illegal objective. *United States v. Sink*, 586 F.2d 1041, 1050 (5th Cir. 1978); *United States v. Harvey*, 464 F.2d 1286 (5th Cir. 1972), *cert. denied*, 410 U.S. 938, 93 S.Ct. 1399, 35 L.Ed.2d 604 (1973); *Bradford v. United States*, 413 F.2d 467, 470 (5th Cir. 1969); *Walker v. United States*, 342 F.2d 22, 25 (5th Cir.), *cert. denied*, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965). This overt act must be susceptible of demonstrating that the conspirators had more than a subjective mental intent to commit a crime. *See United States v. Small*, 472 F.2d 818, 819 (3rd Cir. 1972).

■ The key to the government's case is its contention that at Wiesbaden the alleged conspirators agreed to export the LTN–51s without a license. This conclusion is wholly based on Hardt's inability to supply an end user. Because an end user was required to obtain an export license, the government argues, Wieschenberg and Heiser must have agreed to export the LTN–51s without a license. The agreement must have been tacit. Williams participated in the meeting, and his testimony discloses no stated agreement to this effect. Subsequent discussions and meetings between Heiser, Wieschenberg and Williams dispel the plausibility of this inference and, to the contrary, support the inference that they were still concerned about obtaining an export license.

Until the meeting on October 8 no evidence supports the conclusion that an agreement to export the LTN–51s without a license was reached. All indications point toward exportation with a license, a legal activity. Williams testified, however, that on October 8, he, Heiser, and Wieschenberg met and discussed possible ways of exporting the LTN–51s without a license. This is the first and strongest evidence the government can muster in support of an inference of illegality that could sustain these convictions. We are unwilling, however, to hold that mere discussions susceptible of either an illegal or a legal interpretation can be sufficient to sustain a challenge to the sufficiency of the evidence when an agreement with an illegal purpose and an overt act in furtherance of the conspiracy must be established.[8]

Under the shadow of the great mass of evidence that pertained to other charges, Heiser and Wieschenberg appeared suspicious and unsavory, but juries "must not be permitted to convict on suspicion and innuendo." *United States v. Palacios*, 556 F.2d 1359, 1365 (5th Cir. 1977). We have held that "mere proof of association with one 'bad man' is insufficient without more to show [the] necessary agreement to commit criminal acts." *United States v. Oliva*, 497 F.2d 130, 134 (5th Cir. 1974). The Supreme Court has warned, "[C]harges of conspiracy are not to be made out by piling inference upon inference." *Ingram v. United States*, 360 U.S. 672, 680, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943)). The sixth circuit had a firm grasp of this concept when they stated in *United States v. Van Hee*, 531 F.2d 352, 357 (6th Cir. 1976) (quoting *United States v. Saunders*, 325 F.2d 840, 843 (6th Cir. 1964), *cert. denied*, 379 U.S. 978, 85 S.Ct. 677, 13 L.Ed.2d 568 (1965)),

8. We recently held in *United States y. Villarreal*, 546 F.2d 1145 (5th Cir.), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977), and *United States v. Marable*, 574 F.2d 224 (5th Cir. 1978), that telephone conversations and meetings between conspirators and government agents concerning an illegal act, the sale of heroin, were overt acts in furtherance of the conspiracies. These cases, however, are distinguishable. Neither case involved a situation in which the conspirators were involved in both legal and illegal activities from which the jury would have to infer, first, that the conspirators agreed to accomplish an illegal objective and, second, that the discussions were in furtherance of the illegal activity. Accordingly, our holding today is not inconsistent with these recent pronouncements.

**336**

[e]vidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal.

The government has shown that Heiser and Wieschenberg associated with one another and that they did so while conducting discussions about possibly selling and exporting LTN–51s to Russia.

To sustain their convictions the government would have us hold, first, that it is permissible for the jury to infer an illegal purpose from conduct which supports both a legal and an illegal inference and second, for the jury to infer that the discussions that took place were in furtherance of the illegal, not the legal, activity.

■ To embrace the government's contention we must hold that mere association of two or more persons to accomplish legal and possibly illegal goals, accompanied by discussions to promote those goals, but with no discernible direction toward either the legal or the illegal objectives, amounts to criminal conduct under 18 U.S.C. § 371. Our authorities cannot be correctly interpreted as supporting such a result. Conviction of a criminal conspiracy must be supported by proof beyond a reasonable doubt of an agreement to accomplish an illegal act and an overt act in furtherance of that agreement's particular illegal purpose.

In this case it proved that defendants repeatedly discussed the legal exportation of LTN–51s. Problems developed, and the project was abandoned. On at least one occasion during this interval the possibility of exporting the gyros without the required license was considered.

■ Measured by the standard of *United States v. Warner*, this proof fails. We conclude that a reasonable jury could not properly have found beyond a reasonable doubt that defendants reached an agreement to export the LTN–51s without a license and that an overt act in furtherance of this illegal agreement was committed. Defendants were entitled to a judgment of acquittal on Count III, and the convictions must therefore be reversed.

REVERSED.