**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Matthew J. MOSCHETTA, John Leonard
Lett, Defendants-Appellants.**

No. 81–5239.

United States Court of Appeals,
Fifth Circuit.*
Unit B

April 12, 1982.

Neal R. Sonnett, Benedict P. Kuehne, Miami, Fla., for Moschetta.

Flynn, Rubio & Tarkoff, Vincent J. Flynn, Miami, Fla., for Lett.

* Former Fifth Circuit Case, Section 9(1) of Public Law 96–452–October 14, 1980.

Martin R. Raskin, Miami, Fla., William C. Bryson, Washington, D.C., for plaintiff-appellee.

Before MORGAN, TJOFLAT and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Appellants Matthew J. Moschetta and John Leonard Lett were convicted, after a joint jury trial, of violating 18 U.S.C. § 371 (1976) by conspiring to receive and to transfer in the United States 50,000 M–16 rifles without registering the weapons on the National Firearms and Transfer Record or notifying the Secretary of Treasury, all in violation of the Gun Control Act of 1968, 26 U.S.C. § 5801 *et seq.* (1976) (the Act). Moschetta, a licensed gun dealer, was convicted of unlawfully failing to obtain the Secretary's approval of the sale of an unregistered AR–15 automatic rifle, 18 U.S.C. §§ 922(b)(4), 924(a) (1976), or to meet the record keeping requirements of federal law, 18 U.S.C. §§ 922(b)(5), 923, 924(a) (1976). Moschetta also was convicted of possessing and transferring the same AR–15 rifle in violation of the Act; and Lett was convicted of aiding and abetting these violations.

In this appeal, both appellants challenge the sufficiency of the evidence to support the conspiracy charge. Lett makes the same attack on his convictions for the substantive offenses. If we do not agree that appellants should have been acquitted of these offenses, we are asked to grant them a new trial because of prejudicial trial errors. Our examination of the record convinces us that the evidence was sufficient to support the challenged convictions and that no reversible error occurred at trial. We therefore affirm.

## I.

In November 1978, Gerald Deutsch, a security guard for Bodin Apparel Company of Hialeah, Florida, told his supervisor, Gregorio Suarez, that he had a "source" who could supply him with various types of weapons. Suarez immediately reported this to the Federal Bureau of Alcohol, Tobacco and Firearms (ATF). ATF asked Suarez to work undercover to locate Deutsch's source of supply, and Suarez agreed.

On November 16, 1978, Suarez met Deutsch and expressed an interest in purchasing some machine guns and plastic explosives. Deutsch took Suarez to Calamity Jane's Gun Shop in Ft. Lauderdale, Florida, and introduced him to appellant Moschetta, the owner of the shop and a licensed firearms dealer. Deutsch told Moschetta that Suarez was interested in buying unregistered weapons. After inquiring briefly into Suarez' background, Moschetta agreed to meet Suarez later, at another location, to discuss the possibility of making a deal.

Over the course of the next two months, Suarez told Moschetta of his plan to equip a small army in Central or South America. Moschetta informed Suarez that he could provide all the machine guns, explosives and grenades that Suarez might need. Moschetta also indicated that his gun shop was equipped to convert semi-automatic rifles, such as the AR–15 used by American military forces, to fire automatically.

On January 18, 1979, Moschetta offered to sell Suarez 50,000 M–16 automatic rifles, with rocket launchers attached, for $600 each, a total purchase price of $30 million. Moschetta told Suarez that if he was interested in making a deal at that price, a meeting with those who had direct access to the rifles would be arranged. Suarez wanted the rifles, so Moschetta arranged the meeting.

Later in the day, at a local restaurant, Moschetta introduced Suarez to Paul Dengler and appellant Lett. During the ensuing conversation, Suarez learned that Dengler controlled the supply of the M–16 rifles (U. S. Army rifles that had been captured during the Vietnamese War), and that Lett was Moschetta's pilot whose job was to deliver weapons to Moschetta's customers. Suarez, following ATF's instructions, told Moschetta, Lett and Dengler that he would purchase the M–16s at the price Moschetta

had quoted, provided the guns were delivered to him in Florida or in Puerto Rico. Suarez was informed that to deliver the weapons in Florida or Puerto Rico would violate federal firearms laws; Central or South America were therefore suggested as alternatives. Delivery in the United States was not ruled out, however, and it was agreed that the matter would be discussed further at a later date. Suarez suggested that in the interim "his people" would probably want to see a sample of the M–16s.

On February 3, 1979, the negotiations resumed. Present were Moschetta, Lett, Suarez, and Suarez' "people," ATF undercover agents Evelio Velasco and Joseph Benitez. The transaction would go forward, Lett announced, if Dengler received a telex from Velasco's bank indicating that Velasco had funds on deposit sufficient to cover the purchase price of the M–16 rifles. Velasco replied that no telex would be sent until he saw a sample of the guns, so Moschetta and Lett agreed to produce a sample. Velasco also insisted that the weapons be delivered in the United States, but Lett balked at the idea and the meeting concluded.

On February 13, Moschetta telephoned Suarez and told him that he had a sample M–16 for his inspection. Moschetta said that he and Lett would deliver the sample to Suarez in Miami the next morning. The meeting went as scheduled, but the sample turned out to be an AR–15 that had been converted to fire automatically, not an M–16. Lett apologized for the substitution, explaining that they had sent for an M–16 but it had not yet arrived. Moschetta said that the converted AR–15 was the equivalent of an M–16. Like an M–16, it had a selector switch that could convert the rifle from single shot to semi-automatic or to automatic firing. The only difference between the two weapons, Moschetta indicated, was that the switch position for automatic firing was not marked on the AR–15. To compensate, Moschetta drew a diagram so that Suarez would know how to position the switch for automatic firing. Moschetta

told Suarez that the converted AR–15 was "illegal," but safer to have in one's possession that an M–16 because the position for automatic firing was unmarked. With markings only for single shot and semi-automatic firing, the gun appeared to be "legal."

Suarez took the AR–15 sample directly to the ATF where the weapon was test-fired and found to be fully automatic. ATF also determined that the weapon had not been registered on the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841; nor had an application to transfer the gun been filed with the Secretary of Treasury as required by 26 U.S.C. § 5812; nor had Moschetta, as a licensed firearms dealer, received authorization from the Treasury to transfer the weapon as required by 18 U.S.C. § 922(b)(4).

On February 20, 1979, Suarez and Velasco met Moschetta and Lett to discuss the performance of the AR–15 sample and to strike a bargain for 50,000 M–16s. They were informed that the M–16s were in Europe and that only 30,000 remained. Velasco said he would buy them if delivery were made in the United States or Puerto Rico. Lett said he was willing to fly the weapons to Puerto Rico or to South Florida but that the price would have to be increased because of the risk. Lett added that the price would have to be paid in advance, before the guns left Europe; otherwise Dengler would not turn them over. Velasco would not agree and offered several alternatives. After the meeting Moschetta and Lett communicated these alternatives to Dengler. On February 22, they met once again with Suarez and Velasco and told them that the arms deal would be concluded if Dengler's demand for advanced payment were met. Velasco would not accede to Dengler's demand, and the deal was called off. The indictment in this case followed, charging Moschetta and Lett with violating the Gun Control Act of 1968, 26 U.S.C. § 5801, *et seq.* (1976) (the Act) and the requirements of 18 U.S.C. §§ 922–924 (1976), and, togeth-

er with Dengler, of conspiring to violate the Act. 18 U.S.C. § 371 (1976).[1]

## II.

### A.

■ Moschetta and Lett contend that the government failed to meet its burden of proving that they conspired to receive 50,000 M–16s and transfer those weapons to Suarez in violation of the Gun Control Act of 1968. The Act makes it illegal to receive an automatic weapon that has not been registered on the National Firearms and Transfer Record, 26 U.S.C. § 5841, and to transfer such a weapon *in the United States* without filing the proper forms with the Secretary of Treasury, 26 U.S.C. § 5812. If appellants' agreement was to obtain weapons from Dengler in Europe and to transfer them to Suarez in Central or South America, they could not be convicted of the criminal conspiracy; the performance of such an agreement, though perhaps morally reprehensible, would not violate the Act. *See Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975) (the essence of a conspiracy is an agreement to commit an act which is unlawful). Similarly, if the agreement was to deliver the guns to Suarez in the United States only after proper registration and compliance with the Act, no criminal violation could be shown. *See United States v. Wieschenberg,* 604 F.2d 326 (5th Cir. 1979).

■ Appellants concede that we must affirm their convictions unless we find that reasonable minds could *not* conclude that the evidence was inconsistent with every reasonable hypothesis of innocence. *United States v. MacPherson,* 664 F.2d 69, 73 (5th Cir. 1981); *Wieschenberg,* 604 F.2d at 330. Appellants contend, however, that the government's evidence in this case was consistent with a reasonable hypothesis of innocence: they did discuss the possibility of delivering unregistered weapons to Suarez and Velasco in the United States, but never reached an agreement to deliver the weapons in this country. They point out that

even if the proof established an agreement to deliver weapons in the United States, it did not show that they intended to deliver those guns in violation of the Act. If appellants' view of the evidence is correct, we cannot sustain their conspiracy convictions; the "mere association of two or more persons to accomplish legal and possibly illegal goals, accompanied by discussions to promote those goals, but with no discernible direction toward either the legal or illegal objectives," does not amount to criminal conduct under the conspiracy statute, 18 U.S.C. § 371. *Wieschenberg,* 604 F.2d at 336.

Appellants suggest that the government's proof of their agreement to deliver unregistered, and therefore unlawful, weapons in the United States is no more persuasive than that offered in *Wieschenberg,* where the defendants were charged with conspiring to export a navigational device to the Soviet Union without a license. There we refused to sustain the convictions because the government established merely that the defendants discussed the possibility of exporting the device either legally, with an export license, or illegally, without such a license. The evidence that the defendants agreed to export the navigational device without a license was, therefore, counterbalanced by equally credible evidence that the defendants would obtain the requisite license before completing the transaction. *Id.* at 335.

■ When in this case we resolve all reasonable inferences and credibility choices in favor of the jury verdicts of guilt, as we must, *United States v. Black,* 497 F.2d 1039 (5th Cir. 1974), we conclude that the evidence of appellants' intent to act illegally is not, as in *Wieschenberg,* in equipoise. It is true that Moschetta and Lett initially displayed reluctance to deliver the M–16s in the United States. As the negotiations progressed, however, it became clear that for the right price they were willing to bring the weapons to Florida or Puerto Rico without complying with the Act. At their final

1. The charges against Dengler were dismissed prior to trial at the request of the government.

meeting with Suarez and Velasco on February 22, 1979, appellants told them the arms deal was all set; delivery could be made either in Puerto Rico or Florida. Nothing remained but the payment. With this evidence before it, the jury was authorized to conclude that Moschetta and Lett conspired to receive the M–16 rifles and to transfer them to Suarez in violation of the Act. The convictions in the conspiracy count must therefore be affirmed.

### B.

Lett claims that the evidence was insufficient to support his convictions for aiding and abetting Moschetta's possession of the unregistered AR–15 sample and Moschetta's transfer of that weapon to Suarez without filing the required forms with the Secretary of Treasury. Lett's claim is founded on his assumption that the government was required to prove that he knew the gun was unregistered and that Moschetta had not filed an application for transfer with the Secretary. He contends that the government's proof on this point was inadequate because it left standing at least one reasonable hypothesis of innocence: that because Moschetta was a licensed firearms dealer, Lett had no reason to believe that Moschetta did not legally possess and transfer to Suarez the converted AR–15.

■ Lett's assumption, that it is the government's burden in a prosecution under 26 U.S.C. § 5861(d) to prove that the defendant actually knew the weapon was unregistered, is devoid of merit. *United States v. Freed*, 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971); *United States v. Sedigh*, 658 F.2d 1010, 1012 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). The statute makes it unlawful for any person "to receive or possess a firearm which is not registered to him." 26 U.S.C. § 5861(d). The "only knowledge required to be proved [is] that the instrument . . . was a firearm." *Freed*, 401 U.S. at 607, 91 S.Ct. at 1117. Similarly, to establish an unlawful transfer, 26 U.S.C. § 5861(e), mere knowledge that the instrument was a firearm is sufficient.

It is not necessary in either case that the charged party know that his reception, possession, or transfer of the firearm violated the Act.

In sum, the undisputed evidence in this case shows that Lett aided Moschetta in the receipt and transfer of an instrument he knew to be a firearm, that the firearm was unregistered and that no application for transfer had been filed with the Secretary of Treasury. Because proof of specific intent was not required, the jury's finding of Lett's guilt on these substantive counts must be sustained.

### III.

In his opening statement to the jury, made prior to the government's presentation of its case in chief, Moschetta's counsel said that his client would testify that he was carrying out his duties as an agent of the Central Intelligence Agency (CIA) in dealing with Suarez and his associates, Velasco and Benitez. Moschetta would testify, according to counsel, that he and another CIA agent, one Virgil Grey, met Suarez in the course of their investigation of arms sales to Central and South America.

In the government's case in chief, the prosecutor, anticipating Moschetta's "CIA defense," introduced into evidence, over Moschetta's objection, an affidavit of a CIA staff attorney, Philip Kunsberg, who averred that his office had caused a search to be made of every CIA file that would have shown whether Moschetta or Virgil Grey had ever been employed by the CIA or assisted the agency in any activity, and that nothing was found to indicate that either of them had ever been involved with the CIA. Moschetta's objection to the introduction of the affidavit was that it violated the confrontation clause of the sixth amendment; he wanted the right to cross examine the staff attorney in the presence of the jury. Moschetta expressly waived any hearsay objections he might have had to the affidavit as well as the requirement that the lack of an official record be attested to by an officer certified as the legal custodian of

the official record or his deputy.[2]  *See* Fed. R.Crim.P. 27; Fed.R.Evid. 803(10), 902(4). In effect, then, Moschetta stipulated that the staff attorney was the person with legal custody of the records relevant to this case.

We have previously addressed the admissibility of affidavits establishing the nonexistence of records of federal agencies. *See United States v. Harris,* 551 F.2d 621 (5th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 125, 54 L.Ed.2d 98 (1977); *United States v. Mix,* 446 F.2d 615 (5th Cir. 1971). For example, in upholding the admissibility of an ATF affidavit that the defendant was not a licensed firearms dealer, we observed that the exception to the hearsay rule in Fed.R. Evid. 803(10), which authorizes such affidavit proof of the absence of a public record, is "justified because evidence admitted under [the rule] is in its nature highly reliable . . . and because there is a substantial need for such evidence." *Harris,* 551 F.2d at 622.

■ We have also held that the admission of these highly reliable affidavits to prove the nonexistence of records does not violate the confrontation clause of the sixth amendment. *Mix,* 446 F.2d at 622–23 (the admission of an ATF affidavit, asserting that no record of a machine gun registration was found in the National Firearms Registration and Transfer Record, does not violate the confrontation clause). Moschetta acknowledges this precedent, but asserts that it is inapposite in this case because the government did not show that the CIA's records are reliable. The same argument was rejected in *United States v. Lee,* 589 F.2d 980 (9th Cir.), *cert. denied,* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979). The Ninth Circuit concluded the secretive nature of the business conducted by the CIA was not a sufficient reason to doubt the veracity of its officials. This was especially true, the court observed, where, as here, the CIA official knew that his affidavit would become evidence in a criminal prosecution and was well aware of the legal consequences of false swearing. *Id.* at 988. We agree with the Ninth Circuit, and, accordingly, find no merit in Moschetta's sixth amendment objection.

We have carefully examined appellants' other claims of error and find them also without merit. The judgments of conviction are, therefore,

AFFIRMED.

---

**2.** Moschetta also waived his objection that the affidavit was irrelevant. The evidence obviously was not relevant or material to any issue in the case as of the moment the affidavit was offered into evidence. It is true that Moschetta's counsel had mentioned in his opening statement that Moschetta would testify that he was a CIA agent, which meant that he could not have acted with specific criminal intent in his dealings with Suarez and the undercover ATF agents. Counsel's statement, however, standing alone, did not put in issue for purposes of the government's case in chief the question whether Moschetta was a CIA agent. Moreover, as for the substantive offenses, whether Moschetta acted with specific intent to violate the law could not have been an issue, since specific intent was not an element the government was required to establish. Thus, even if Moschetta had taken the stand, the court would have been required to sustain a government objection on relevancy grounds to his CIA alibi.

As for the conspiracy charge, whether Moschetta was a member of the CIA, and thus lacked the requisite criminal intent, was never put in issue by Moschetta because he declined to take the stand. Moschetta's counsel did call three witnesses to the stand in an attempt to establish Moschetta's CIA connection, but all they could offer was rank hearsay that Moschetta once told them he was working for the CIA. The government did not object to this hearsay. Had it done so, and had it not run the risk of reversible error by anticipating Moschetta's CIA defense during the presentation of its case in chief, the problem we now resolve would not have arisen.