**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Patricia CORLEY, Defendant-Appellee.**

No. 86–5693.

United States Court of Appeals,
Eleventh Circuit.

Aug. 19, 1987.

Leon B. Kellner, U.S. Atty., Theresa M.B. Van Vliet, David O. Leiwant, Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellant.

Robert A. Smoley, N. Miami Beach, Fla., Lance Joseph, Coral Gables, Fla., for defendant-appellee.

Before FAY and EDMONDSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Patricia Corley was indicted for conspiring to defraud Biscayne Federal Savings and Loan in violation of 18 U.S.C. § 371 [1] (Count I) and with aiding and abetting the embezzlement of funds from the savings

---

1. 18 U.S.C. § 371 (1982), in pertinent part, provides the following:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

and loan in violation of 18 U.S.C. § 657[2] and 18 U.S.C. § 2[3] (Count II). After hearing all the evidence, a jury acquitted Corley on the substantive count but was unable to reach a verdict on the conspiracy count. Accordingly, the district court declared a mistrial on the conspiracy count.

Corley then moved to dismiss Count I on double jeopardy grounds or to estop the United States from introducing certain evidence at her retrial on Count I. The district court denied the motion to dismiss but agreed to exclude any evidence relating to the substantive count when retrying the conspiracy count. The government conceded that such a limitation would irreparably damage its case, so it appealed the court's ruling, contending that collateral estoppel does not apply where a jury has reached inconsistent conclusions. We find that the jury did not reach an inconsistent verdict, and we affirm the district court's use of collateral estoppel.

## I. FACTS

The scheme to defraud the savings and loan originated with Rolando Fernandez, who had obtained a copy of a banking institution agreement signed by Juan Thomas Pena and starter checks for Pena's checking account at Biscayne Federal. Fernandez suggested to Alex Diaz de Otazu (Diaz) that Diaz transfer the approximately $27,000 in Pena's account at Biscayne Federal to a separate account at a different bank. Later, the two of them would withdraw the money to divide between them. Diaz accepted the documents from Fernandez, but he decided to implement a different plan. He would simply write a check for all the money in Pena's account at Biscayne Federal. Then he and Fernandez would split up the money.

Subsequently, Diaz contacted Nidia Puentes, a former girlfriend who he owed $2,500. Puentes had previously worked at Biscayne Federal, and Diaz wanted to know if she knew anyone who would help him cash Pena's check. Puentes stated that she would ask around and contact Diaz later.

Puentes then called Patricia Corley, who worked in the personnel department at Biscayne Federal. During the trial, Puentes presented two conflicting versions of how much Corley knew about the scheme initially. On direct, Puentes stated that she asked Corley if she knew anyone who would help a friend cash a bad check in return for $1,000. Corley said that she would ask her former sister-in-law, Debra Kummerer, a teller at Biscayne Federal. (Record, Vol. 3, p. 7). Later, Corley and Puentes spoke again, and Corley informed Puentes that Kummerer agreed to help. (Record, Vol. 3, p. 8).

During cross-examination, however, Puentes presented a different version of

**2.** 18 U.S.C. § 657 (1982) provides the following:

Whoever, being an officer, agent or employee of or connected in any capacity with the Reconstruction Finance Corporation, Federal Deposit Insurance Corporation, National Credit Union Administration, Home Owners' Loan Corporation, Farm Credit Administration, Department of Housing and Urban Development, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, or any land bank, intermediate credit bank, bank for cooperatives or any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation or by the Administrator of the National Credit Union Administration or any small business investment company, and whoever, being a receiver of any such institution, or agent or employee of the receiver, embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount or value embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**3.** 18 U.S.C. § 2 (1982) states the following:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**934**

her request for help. As to the reason for the assistance, Puentes stated, "So I don't know if I confided in her to tell her but she did it. She got someone to help do this." (Record, Vol. 3, p. 44). In any event, Kummerer agreed to help Diaz cash the bad check by not scrutinizing it as closely as usual.

After learning that someone at the bank would assist him, Diaz worried about the type of identification he would need to cash the check. Diaz called Kummerer and found out that he would need a passport, driver's license, social security card or credit card. (Record, Vol. 4, pp. 105–106). The government contended that Corley gave Puentes her daughter's social security card as one of the forms of ID. Once again, the testimony at trial on this point was contradictory. Puentes testified on direct that Corley gave her the card when the two of them were alone. (Record, Vol. 3, p. 11). The defense impeached that testimony by reading from a statement Puentes had given to the Federal Bureau of Investigation (FBI). In that earlier statement, Puentes had recalled that Kummerer was present when Corley handed her the social security card. (Record, Vol. 3, p. 53). The defense theory was that Kummerer, unbeknownst to Corley, had taken the social security card of Corley's daughter. At that time, Kummerer was staying with Corley three or four days a week. (Record, Vol. 4, p. 143.) In support of the defense theory, Diaz testified that, according to his information, Kummerer had given the card to Puentes. (Record, Vol. 6, p. 6.) [4]

With a social security card [5] and two other fake pieces of identification, Diaz went to Biscayne Federal Savings & Loan on July 28, 1983, and presented a forged check for $25,500 to Debra Kummerer. After Kummerer had her supervisor approve the check, Kummerer cashed the check, but she did not list any of the information from Diaz's identification cards on the back of the check.

That evening, after Diaz gave Fernandez his share of the money, approximately $17,000, Diaz visited Puentes. He gave her $3,400, $2,400 for herself, and $1,000 for Kummerer.[6] (Record, Vol. 3, p. 13; Vol. 6,

4. During the direct examination of Diaz, the following colloquy occurred:

Q: Do you know how she [Puentes] got that social security card?
A: She never told me specifically how she obtained the card. All she did state is that the card came from the teller Debbie [Kummerer] or a relative of Debbie's.
Q: Which was it from, Debbie or a relative?
A: It was given to her by Debbie. It is unknown to me whether it was a relative of Debbie's. I believe it was a relative of Debbie's that the card came from.
Q: What leads you to believe that?
A: That's what she stated to me.
Q: Who stated?
A: Nydia Puntes [sic].
Q: Nydia stated that the card was provided by a relative of Debbie's?
A: No. By Debbie and it had come from a relative of Debbie.
(Record, Vol. 6, p. 6).
    *    *    *    *    *    *
Q: So that I understand your answer, Mr. Diaz, Nydia told you what?
A: Nydia told me that the social security card she was giving me had come from Debbie and had been given to Debbie by a relative of hers.
(Record, Vol. 6, p. 7).
In addition, during cross-examination, the defense reviewed Diaz's earlier statement to the FBI.

Q: There is a piece of paper behind you, Mr. Diaz, which is your statement which you have referred to on a couple of occasions. I ask you to draw your attention to the bottom half of the third paragraph which is your verbatim statement and see if you didn't make the last sentence of that paragraph?
A: "And informed me that the carad [sic] had been obtained from Debbie."
Q: Didn't you make that statement?
A: From Debbie, yes, sir.
(Record, Vol. 6, p. 39).

5. Diaz testified that he altered the social security card to read in the name of Juan Thomas Pena, the account holder's name. He did not recall the name that he whited out, but he thought the last name was short, less than five to six letters. (Record, Vol. 6, pp. 10–12).

6. Diaz thought the $1,000 was only for Debra Kummerer, as his following testimony evidences:

Q: And after you cashed that check, you, in fact gave Nydia Puntes [sic] a thousand dollars for Debbie; correct?
A: Correct.
Q: You were never told by anyone else that there was another person involved and that the money would again be split for some fourth or fifth party; isn't that also true?

p. 15). Thereafter, the two of them drove to Corley's house. While Diaz waited in the car, Puentes went inside and allegedly gave Corley $1,000. (Record, Vol. 3, p. 13). Corley then supposedly divided the money in half with Kummerer, who was also at the house at the time. (Record, Vol. 4, p. 114).

About a week or two after Diaz cashed the forged check, Puentes called Corley and Kummerer to a meeting at a Howard Johnson's. At that meeting, they discussed what to do since Diaz had been picked up for questioning by the FBI. They decided to wait and see if Diaz reported their involvement. (Record, Vol. 3, pp. 23–25). Puentes did not recall what Corley said at the meeting, but she was sure that Corley did not deny her involvement in the situation. (Record, Vol. 3, pp. 27–28).

Subsequently, Diaz confessed the check forging to the FBI and named Puentes and Kummerer as his accomplices. When the FBI questioned Puentes and Kummerer, they implicated Corley in the scheme.

Before trial, the prosecution offered to charge the defendants only with conspiracy to defraud if they pleaded guilty. Corley refused. All the other defendants accepted the plea bargain and agreed to testify against Corley. After hearing the testimony of Puentes, Kummerer, Diaz and a character witness for Corley, the jury acquitted Corley of the substantive charge but was unable to reach a decision on the conspiracy charge. The district court then declared a mistrial and, upon Corley's motion, applied collateral estoppel to limit the

> A: It is true that it was not stated to me that there would be any further person involved. (Record, Vol. 6, p. 40).

7. The district court specifically ordered the government collaterally estopped from presenting the following evidence:

> First, that defendant Corley engaged in telephone conversations with the co-defendant Puentes during which Corley was told of the plan to embezzle monies from Biscayne Federal Savings & Loan, her employer, and the need for assistance of an employee of the bank in carrying through the plan. Corley was also informed that the employee who provided the assistance would be paid

government's evidence on Corley's retrial. The government appealed this limitation.

## II. DISCUSSION

Collateral estoppel, embodied in the fifth amendment guarantee against double jeopardy, provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970). Thus, collateral estoppel in the criminal context prohibits the government from forcing a defendant to defend against charges or factual allegations which he overcame in an earlier trial. *Albert v. Montgomery,* 732 F.2d 865, 869 (11th Cir.1984). For a defendant to invoke the doctrine, "the fact sought to be foreclosed by the defendant must necessarily have been determined in his favor in the prior trial; it is not enough that the fact *may* have been determined in the former trial." *United States v. Irvin,* 787 F.2d 1506, 1515 (11th Cir.1986) (emphasis in original).

Here the district court ruled that in order to acquit Corley the jury must necessarily have found that Corley did not commit the following two overt acts:

(1) procure Kummerer's assistance in cashing a bad check after learning all about the planned embezzlement from Puentes

(2) provide a social security card as a fake identification card for Diaz.[7]

> $1,000.00 from the proceeds of the crime. Corley then proceeded to secure the assistance of co-defendant Kummerer, a teller at the bank, in cashing the check.
> Second, in connection with co-defendant Diaz' need for identification in the name of Juan Thomas Pena to negotiate the check, the defendant Corley provided Puentes and Diaz with a social security card. This card (there is conflicting evidence as to what, if anything, was printed on the card) was obtained from Corley at her home by Puentes who in turn passed it to Diaz who was waiting outside the home.

We agree that the jury must have based Corley's acquittal of the fraud charge on these findings.[8]

▇▇ The government argues that the jury reached an inconsistent verdict when it acquitted Corley of the substantive crime of fraud but refused also to find her innocent of conspiracy to defraud. Of course, conspiracy and the related substantive offense which is the object of the conspiracy are considered separate and distinct crimes. *Ianelli v. United States*, 420 U.S. 770, 777–78, 95 S.Ct. 1284, 1284–90, 43 L.Ed.2d 616, 623 (1975); *United States v. Romeros*, 600 F.2d 1104, 1105 (5th Cir.1979), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980); *United States v. Seelig*, 498 F.2d 109, 112 (5th Cir.1974).[9] An acquittal on the substantive count does not foreclose prosecution and conviction for a related conspiracy. *United States v. Veltre*, 591 F.2d 347, 349 (5th Cir.1979). In fact, there is nothing necessarily inconsistent, in law or logic, with such a result. "We do suggest, however, that such a result should engage our judicial skepticism. A critical analysis of the facts is required when such a contrariety of results does appear." *United States v. Caro*, 569 F.2d 411, 418 (5th Cir.1978).

▇▇ Here, the government has stipulated that the overt acts excluded by the district court are the only evidence of Corley's involvement in a conspiracy, but the jury was not aware of that stipulation during the trial. At least one member of the jury believed that Corley was not guilty of the substantive count but that she was a member of the conspiracy, even though she did not commit any overt acts in furtherance of the conspiracy.[10] The elements of a conspiracy under 18 U.S.C. § 371 are an agreement between two or more persons, an unlawful purpose, and an overt act committed by one of the co-conspirators in furtherance of the conspiracy. *United States v. Perkins*, 748 F.2d 1519, 1527 (11th Cir. 1984); *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir.1979). Consequently, in order for a juror to find that Corley was a member of the conspiracy, the government must have shown beyond a reasonable doubt that a conspiracy existed, that Corley knew of it and that she intended to associate herself with the objectives of the conspiracy. *See United States v. Horton*, 646 F.2d 181, 184 (5th Cir. Unit A), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 381 (1981); *United States v. Caice-*

---

**8.** The government suggests that the jury could have based Corley's acquittal solely on the character evidence presented at trial. In the jury instructions, the district court told the jury that they could consider character evidence with all the other evidence in deciding whether the government had proven beyond a reasonable doubt that Corley willfully committed the crimes charged. If the government proved beyond a reasonable doubt that Corley committed the overt acts at issue, a rational jury could not acquit solely based on character evidence. A determination concerning the two overt acts was still necessary.

**9.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981.

**10.** If Corley's liability on the substantive count was based solely on the *Pinkerton* vicarious liability doctrine, the verdict might be inconsistent. Under the *Pinkerton* doctrine, the government can charge a conspirator with the substantive crimes committed by his co-conspirator so long as the crimes were committed in furtherance of the conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the

plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Pinkerton*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Here, the government based Corley's criminal liability for the substantive count on her actions. In order to prove Corley aided and abetted the embezzlement scheme, the government had to show that Corley associated herself with the criminal venture, that she wished to bring it about, and that she sought by her actions to make it succeed. *See United States v. Thomas*, 676 F.2d 531, 535 (11th Cir. 1982). The court instructed the jury on these elements under 18 U.S.C. § 2 but not the imputation element of *Pinkerton* vicarious liability. Before a defendant may be convicted of substantive offenses on the basis of vicarious liability, a jury instruction outlining that basis for liability must be given. *United States v. Monaco*, 702 F.2d 860, 881 (11th Cir.1983). Consequently, we do not rely on that theory when considering the consistency of the two verdicts. *See United States v. Bain*, 736 F.2d 1480, 1487 n. 12 (11th Cir.1984) (district court did not give *Pinkerton* liability instruction, so Eleventh Circuit could not rely on that theory in affirming the convictions).

*do-Asprilla,* 632 F.2d 1161, 1166 (5th Cir.), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 201 (1981). There is no question about the presence of a conspiracy; Puentes, Diaz, and Kummerer admitted their involvement, and they all pleaded guilty to conspiracy to defraud. The issue the jury had to decide was whether Corley was a co-conspirator.

Testimony at trial, not including the evidence excluded by the district court, was that Kummerer told Corley about the scheme, that Corley did not report the conspiracy, that Corley was having problems at the bank over the forged check (Record, Vol. 3, p. 56), and that Corley attended a meeting to discuss the group's next step after the police had picked up Diaz. No one remembered what Corley had said at the meeting.

Based on this evidence, at least one juror thought Corley guilty of conspiracy. In the view of one juror, the acts and conduct of Corley and the conspirators provided relevant and competent circumstantial evidence of an agreement. Of course, mere proof of association with co-conspirators is insufficient without more to show the necessary agreement to commit criminal acts. *United States v. Wieschenberg,* 604 F.2d 326, 335 (5th Cir.1979). Nevertheless, such association with co-conspirators may be considered as a factor. *United States v. Jenkins,* 779 F.2d 606, 614 (11th Cir.1986); *United States v. Cole,* 704 F.2d 554, 557 (11th Cir.1983).

The evidence in this case may not show beyond a reasonable doubt that Corley was guilty of conspiracy, but there was some evidence, although circumstantial, that she was a member of the conspiracy, even though she did not commit any overt act in furtherance of the conspiracy. We do not have to find that there was sufficient evidence to convict Corley of conspiracy, only that, after excluding the evidence necessary for acquittal on the substantive count, there was sufficient evidence to raise some doubts in a rational jury about Corley's innocence or guilt on the conspiracy count. We find sufficient evidence to raise such doubts. Accordingly, the ver-

dicts were not inconsistent. *Cf. United States v. Whitaker,* 702 F.2d 901 (11th Cir.1983) (court ruled jury could rationally have acquitted defendant of participation in illegal kickback scheme and convicted him of perjury for his statements to a grand jury denying knowledge of the scheme). The government, if it wished to, could retry Corley on the conspiracy charge, despite the exclusion of evidence regarding the substantive crime.

For the foregoing reasons, we AFFIRM the district court's use of collateral estoppel to limit evidence of the substantive count.