**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles George SORRELLS, Glen Ray
Bartley, Defendants-Appellants.**

No. 81–5829.

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1983.

Neil H. Jaffee, Fort Lauderdale, Fla., for Charles George Sorrells.

John P. Tynan, Jupiter, Fla., for Glen Ray Bartley.

Stanley Marcus, U.S. Atty., Bruce A. Zimet, Paul A. DiPaolo, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HILL and HATCHETT, Circuit Judges, and HAYNSWORTH *, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Charles George Sorrells, Glen Ray Bartley and two co-defendants were charged in a twenty-one count indictment with conspiracy to possess and transfer illegal firearms, in violation of 18 U.S.C.A. § 371.[1] The indictment further charged Sorrells and Bartley with various substantive offenses of possessing, transferring, and aiding and abetting the possession and transfer of automatic weapons, firearms and si-

---

* Honorable Clement F. Haynsworth, Jr., U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

1. Title 18 U.S.C.A. § 371 provides that:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

lencers, in violation of 26 U.S.C.A. § 5861(d)(e) and 18 U.S.C.A. §§ 922(b)(5), 2(a).[2] The defendants received a jury trial and were found guilty. Sorrells and Bartley filed timely notices of appeal.[3] For the reasons stated below we affirm.

## FACTS

In December, 1980, Gary Peacock, a confidential informant/special employee for the Bureau of Alcohol, Tobacco & Firearms [hereinafter ATF], obtained information that Conrad Uttall was engaged in the illegal sale of explosives, silencers and automatic weapons. Peacock arranged a meeting with Uttall to discuss the sale of some automatic weapons. Peacock informed Uttall that he was involved in smuggling weapons to various generals in Central and South America. Peacock stated that his main interest was in weapons that could be converted to fully-automatic. Uttall informed Peacock that he could supply various automatic weapons and hand grenades for this purpose. Thereafter, between December 18, 1980, and January 13, 1981, Peacock, Uttall, and Goelet (another co-worker of Uttall), occasionally accompanied by Bartley, met weekly to discuss the sale of various automatic firearms and explosives.

On December 23, 1980, Uttall showed Peacock a Valmet semi-automatic rifle and told Peacock that Bartley, an owner of a lawnmower repair shop, could convert the rifle into a fully-automatic weapon. One week later, Uttall also agreed to produce silencers for the automatic weapons he offered to sell Peacock. On January 8, 1981, Uttall gave Peacock the fully-automatic Valmet rifle which he represented to be a prototype of the weapons he could manufacture and furnish.

During a telephone conversation on January 14, 1981, Uttall told Peacock that others were working with him on the conversions. Two days later, Uttall introduced Sorrells to Peacock as one of the people working with him on the conversions. After Uttall left the meeting, Sorrells and Peacock test-fired a fully-automatic carbine, and Sorrells transferred the weapon to Peacock for $300. In a January 17, 1981, telephone conversation, Uttall advised Peacock that Sorrells and Bartley "ought to be able to build anything" and that he had given Sorrells the funding to begin manufacturing operations.[4] Uttall further stated during the phone conversation that Sorrells was going to give him his opinion regarding the feasibility of converting a certain firearm into a fully-automatic weapon.

Peacock met with Uttall and Sorrells later that week in a West Palm Beach restaurant to discuss the possibility of obtaining a certain type of machine gun equipped with

---

**2.** Title 26 U.S.C.A. § 5861 makes it "unlawful for any person . . . (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or (e) to transfer a firearm in violation of the provisions of this chapter . . . ."

Title 18 U.S.C.A. § 922 states:

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

. . . .

(5) any firearm or ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Finally, "[w]hoever commits an offense against the United States or aids, abets, coun-

sels, commands, induces or procures its commission, is punishable as a principal." Title 18 U.S.C.A. § 2(a).

**3.** Bartley, charged only in two counts, was convicted of conspiracy pursuant to 18 U.S.C.A. § 371 (Count I) and possession of unregistered silencers in violation of 26 U.S.C.A. § 5861(d) (Count XXI). Sorrells was also convicted on the conspiracy charge (Count I) and found guilty of transferring unregistered firearms in violation of 26 U.S.C.A. § 5861(e) (Counts XI, XV, XVII, and XX), and possession of unregistered firearms in violation of 26 U.S.C.A. § 5861(d) (Counts X, XIV, XVI, and XIX) and one possession charge (Count XII).

**4.** In conversing with Peacock, Uttall referred to Bartley as "Glen" and to Sorrells as "George." Peacock testified that at the time he understood the reference to "George" as pertaining to Sorrells. He subsequently learned that "Glen" meant Bartley.

a silencer and capable of being fired from within a briefcase. Such a weapon is commonly referred to as an "assassination kit." Peacock testified that Uttall and Sorrells agreed to accompany him to Atlanta in order to view the factory where the kits were produced. Peacock further testified that an unidentified juvenile was present at the meeting because, according to Uttall and Sorrells, the child's presence would divert attention from their conversation.

Later that afternoon, the three men went to Bartley's shop where Uttall introduced Bartley as one of his assistants in the conversion project. At trial, Bartley testified that he had been involved in converting weapons prior to the time of this meeting. Peacock told Bartley he was interested in obtaining silencers and, according to Bartley's testimony, Bartley knew that Peacock intended to export the weapons to South America. On a work table in Bartley's shop, Peacock observed a box for a Charter Arms semi-automatic pistol and several tools used for grinding. Bartley testified that he, Uttall, and Sorrells had converted the Charter Arms pistol into a fully-automatic weapon but that he needed to convert another to perfect the conversion technique for mass production. Thereafter, Uttall, Sorrells, and Peacock went to Uttall's shop where Uttall, in Sorrells' presence, gave Peacock the Charter Arms weapon to take to South America as a prototype machine pistol. At the same meeting, Uttall handed Peacock a pipe bomb. As Uttall handed Peacock the bomb, Sorrells explained how to detonate it. Sorrells, who at trial admitted designing the bomb, also stated at the meeting that if Peacock needed anything destroyed, he would design a bomb.

During a telephone conversation with Peacock the following day, Bartley stated that making silencers was not difficult. He also cautioned Peacock that Uttall's phone might be tapped. During another telephone conversation between Sorrells and Peacock, Sorrells stated that he wanted to "talk turkey" and that he desired to deal directly with Peacock rather than going through Uttall. The men discussed price and quantity in connection with the sale of automatic weapons and silencers. Sorrells mentioned that he was in the process of converting two firearms and discussed the possibility of mass production of guns and silencers. In two subsequent meetings with Peacock, Sorrells explained the conversion process and reported on his progress in converting particular weapons. Uttall was present on both occasions and each time transferred weapons to Peacock.

The record also indicates that during a February 4, 1981, telephone conversation with Peacock, Bartley stated that he had obtained the parts to produce 175 silencers and commenced plans to obtain parts for an additional 175. In determining whether Peacock desired a 100-unit per month deal, Bartley noted that he would obtain his own pipe cutting machine to facilitate speedier production of the silencers. The men agreed that in the future Peacock would front the production money directly to Bartley.

On February 5, 1981, Peacock and ATF Special Agent Chuck Hudson met Sorrells, Goelet and Uttall at the Ft. Lauderdale Executive Airport while other ATF agents surveyed the area. The group had planned to fly prototype weapons to the Bahamas to show Peacock's "buyers." Sorrells rode in the back of Goelet's car with thirteen silencers, forty-three boxes of ammunition, a sawed-off shotgun, numerous conventional handguns and long guns, and a roll of explosive detonation cord. After Uttall opened the car door to show Peacock the various weapons inside, ATF agents arrested Uttall, Goelet, and Sorrells, and seized the above mentioned items, which were later introduced at trial. That afternoon, ATF Special Agents Hudson and Robert Smith applied for, received, and executed a search warrant on Bartley's premises where they discovered 101 silencers and components for several more. Samples of these silencers were also introduced at trial. The evidence at trial further showed that neither Bartley nor Sorrells had any firearms registered in their names and had not ap-

plied for transfer with the Secretary of Treasury.[5]

After the jury returned guilty verdicts against Sorrells and Bartley, the district court sentenced Bartley to concurrent sentences of two years imprisonment on the conspiracy and possession counts, with three months to be served and the remainder suspended. The court sentenced Sorrells to concurrent sentences of fifteen months imprisonment on the conspiracy count, and three years imprisonment on the remaining possession counts, with all but six months suspended.

### ISSUES ON APPEAL

On appeal, Sorrells and Bartley challenge the sufficiency of the evidence to support their convictions on the conspiracy and substantive counts. Sorrells further assigns error to the district court's refusal to give a requested "theory of defense" instruction. In conjunction with his challenge to the sufficiency of the evidence, Bartley contends that the affidavit of ATF Special Agent Smith provided an insufficient basis upon which to establish probable cause to issue a search warrant. Thus, according to Bartley, the evidence obtained under the authority of the warrant was improperly introduced at trial.

Prior to resolving appellants' sufficiency of the evidence claims, we must first address Bartley's claim of insufficient probable cause to justify the granting of a search warrant.

### I.  VALIDITY OF THE SEARCH WARRANT

#### (a) Establishing probable cause

Bartley argues that the trial court erroneously denied his motion to suppress the evidence seized pursuant to the search warrant. The affidavit for the warrant was filled out and signed by ATF Special Agent Smith. The affidavit recounted the events

and information which Peacock provided. Bartley argues that the affidavit was incomplete in that it was totally based on the hearsay of Peacock and that the statements made by Peacock to Agent Smith failed to meet the two pronged test established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *see also, United States v. Flynn,* 664 F.2d 1296, 1301 (5th Cir.1982), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). Agent Smith's affidavit stated the following:

### AFFIDAVIT

Your deponent, Robert Smith, being duly sworn, deposes and says that he is a special agent of Alcohol, Tobacco & Firearms, duly appointed according to law and acting as such.

On January 19, 1981, your deponent was advised by Bureau of ATF Special Employee Gary Peacock, that at approximately 3:30 P.M., Conrad Clement Uttall, Sr., took him to the A & D Mower Shop, 209 West Juno Street, Jupiter, Florida. At this time, Uttall introduced Peacock to "Glenn" who represents himself as the owner of the shop. Uttall stated to Peacock in Glenn's presence that Glenn was going to be manufacturing the silencers for Peacock. Glenn stated that there was no problem in his making the silencers there at his shop.

On January 20, 1981, Glenn stated to Special Employee Peacock in a phone conversation that making "suppressors" was no big deal. He also explained how he had converted the Charter Arms .22 LR, to a fully-automatic machine-pistol and stated that he needed another one to perfect it. Glen also stated that Uttall's phone may be tapped!

On January 24, 1981, Glen stated to Peacock in a phone conversation that

---

**5.** "A firearm shall not be transferred unless (1) the transferror of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm

to the transferree on the application form prescribed by the Secretary ...." 26 U.S.C.A. § 5812(a).

"we've got the muffler straightened out with 175 of them."

On January 29, 1981, Glen stated to Peacock in a phone conversation that he needed to get in touch with Conrad and get some money for the mufflers. He stated that he had a guy to cut the pipe and that all he needed to do was to weld them up. Glen stated that it would be no big deal to whip them up.

On February 3, 1981, Glen stated to Peacock in a phone conversation that the "mufflers" should be ready on Thursday. He stated that he had just gotten some money from Conrad Uttall and had gotten the parts for the "mufflers."

On February 5, 1981, your deponent was advised by Bureau of ATF Special Employee Gary Peacock, that at approximately 1:15 A.M., Conrad Clement Uttall, Sr., met with him and undercover Special Agents Truitt and Hudson at Skytel Aviation in Ft. Lauderdale, Florida. At this time, Uttall stated that he had about a dozen silencers and a variety of other weapons with him. He further stated that he had checked with Glen this morning and that Glen was still working at the shop on the remaining silencers. He further stated that they should be ready later on this same date. Uttall, along with Charles G. Sorrells and Carolyn Nesbitt were arrested at this time in possession of thirteen (13) unregistered silencers, one unregistered sawed-off shotgun and various weapons.

WHEREFORE, your deponent respectfully requests that a search warrant be issued authorizing your deponent to search the premises known as A & D Mower Shop, 209 West Juno Street, Jupiter, florida, to seize unregistered silencers, tools, materials, and other equipment being used in the making of unregistered silencers in violation of Title 26, U.S.C. § 5861(c)(d), which are evidence and facts of the above-said crimes.

> s/ Robert S. Smith
> ROBERT SMITH
> S/A Bureau of Alcohol
> Tobacco and Firearms

Bartley argues that the affidavit was deficient because the Government failed either to corroborate Peacock's statements or to establish Peacock's reliability.

█ The Government offers several bases for affirming the granting of search warrant in strict compliance with the analysis of *Aguilar.* Two of the bases suggested by the Government are that the district judge properly took "judicial notice" of Peacock's reliability and; Peacock's status as a special employee of ATF gave to him a presumption of reliability.[6]

While neither of the Government's arguments can be held as sufficient, in and of themselves, for establishing Peacock's reliability under the separate prongs of *Aguilar,* both of these arguments can be considered as factors under the "totality of circumstances" approach to establishing probable cause announced in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The third argument proffered by the prosecution for affirming the granting of the search warrant is that the affidavit did set forth sufficient information from

---

**6.** The trial judge, at the suppression hearing, informed the defense counsel that he personally knew of Peacock's reliability because Peacock had been before his court on countless occasions as an informant. The defense suggested that the granting of a search warrant, based on a deficient affidavit, was not the "type of thing that the Court can take judicial notice of." We agree with defense counsel. The trial judge's conclusion that his personal knowledge could cure an otherwise defective affidavit is contrary to Fed.R.Evid. 201(b). We cannot accept the trial court's conclusion that a judicial officer can enlist his or her personal knowledge to satisfy the requirements set forth in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Further, we cannot accept the Government's argument that Peacock was entitled to a presumption of reliability. Although there is precedent which dictates that a *full-time* law enforcement officer may be granted a presumption of reliability, Peacock was not a full-time employee of ATF. *See United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Peacock was paid subsistance and rewards for the work he volunteered to do. He received this income without tax deductions and from various federal agencies.

which a magistrate could conclude the existence of probable cause.

The initial rule setting forth the necessary requirements to obtain a search warrant, has historically been characterized as a "two-pronged" analysis:

First, the magistrate must be presented with the facts from which the informant concluded that some criminal activity was taking or had taken place. He must then assess these underlying facts to determine whether or not the inference of criminal activity is warranted. Second, the magistrate must be presented with facts which establish the probable credibility of the informant or the reliability of his information.

*United States v. Martin,* 615 F.2d 318, 323–24 (5th Cir.1980). This two pronged test of *Aguilar* has recently been reconsidered by the Supreme Court in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates,* the Court concluded that "the 'two-pronged' test in *Aguilar v. Texas,* 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1969), . . . [was] intended simply as [a guide] to a magistrate's determination of probable cause, not as [an] inflexible, . . . requirement applicable in every case." *Gates,* —— U.S. at —— n. 6, 103 S.Ct. at 2328 n. 6. The two prongs were not intended to be treated as totally separate and compartmentalized tests. *Id.* at —— – ——, 103 S.Ct. at 2326–2332. It is this court's understanding from a thorough reading of *Gates,* that it is no longer necessary for a magistrate to treat and analyze each prong of *Aguilar* as a separate entity. The focus of judicial inquiry should not be upon a "grading of the paper" of the affiant, but rather, should be based upon whether the constitutional rights of the party subject to the search will be violated if the warrant is issued. In defining and explaining how the *Aguilar/Spinelli* analysis should be applied, the *Gates* Court concluded that a "totality of the circumstances" approach would be a more appropriate test for helping a magistrate determine the existence of probable cause.

Given this direction by the Court in *Gates,* we must, therefore, look to the affidavit as a whole and assess whether there was sufficient information to allow a magistrate to conclude the existence of probable cause. As the Court in *Gates* stated, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at ——, 103 S.Ct. at 2328. Applying the analysis of *Gates* to the information supplied by Peacock to Agent Smith, we find there was sufficient information to establish probable cause.

The affidavit provides a detailed account of the January 19, 1981, meeting with Peacock, Uttall, and "Glen" at the A & D Mower Shop at 209 West Juno Street, Jupiter, Florida. Affiant Smith states further that Peacock related numerous telephone conversations with Bartley, wherein, Bartley reported on his efforts at manufacturing silencers in his shop. While the affiant did not relate that he had previous experience with Peacock's credibility, he did, under oath, describe Peacock as a special employee, thus, implying an existing relationship between Peacock and ATF, which would not likely exist if Peacock were unreliable. The affidavit averred that based upon Peacock's efforts and information, others involved in the crimes had already been arrested, and upon their arrest they were in possession of illegal contraband. This clearly demonstrates that Peacock had provided, in this continuing investigation, corroborated, reliable information. The fact of these arrests, as stated in the affidavit, was not hearsay but rather, the personal knowledge of the affiant. The Court in *Gates* concluded that a deficiency in one part of the *Aguilar* test may be compensated for through a stronger showing of the other prong of the *Aguilar* test. *Gates,* —— U.S. at ——, 103 S.Ct. at 2338.

We do not however, recommend or endorse omissions in the affidavit of the informant's credibility or reliability. The test in *Aguilar* has served many useful purposes aside from insuring that the constitutional

rights of citizens be respected. It has given to law enforcement officers, prosecuting attorneys and the courts a straightforward test for resolving disputes over the issuance of a warrant. We do not view *Gates* as an endorsement of slovenly or careless law enforcement work. Such work will continue to produce problems for the prosecution, the defense and the courts engaged in a case by case analysis rather than a repair to certain and definite rules. The Court in *Gates* stated that *Aguilar* has provided guidance in determining the existence of probable cause and it is not anticipated that departure from these guidelines will be looked upon with favor.

In the present action, there is strong evidence in the record demonstrating that the magistrate had reason, by past experience, to make an affirmative evaluation of Peacock's credibility. The Court in *Gates* stated that:

> If for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. *Gates,* —— U.S. at ——, 103 S.Ct. at 2329. *See United States v. Sellers,* 483 F.2d 37 (5th Cir.1973).

The totality of the circumstances in this case, are so compelling that we find there was no violation of Bartley's fourth amendment rights when the magistrate issued the search warrant, even though in a police academy setting, the affidavit may have been given something less than an "A+." In view of this disposition, we do not address the Government's argument that the evidence ought not be suppressed based upon the "good faith" belief of the officers. *See United States v. Williams,* 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981).

## II. SUFFICIENCY OF THE EVIDENCE

Sorrells and Bartley argue that the Government failed to prove by substantial evidence that they intended to join efforts to accomplish the unlawful end of possessing and transferring illegal firearms. To the contrary, they argue that the evidence is not inconsistent with a reasonable hypothesis of innocence because they believed the firearms had been properly registered by Uttall. Thus, it never occurred to the appellants that they were violating the law.

■ This court recently adopted a new standard for sufficiency of the evidence claims. The Government no longer needs to establish that every hypothesis of innocence be inconsistent with a verdict of guilty. Rather, the standard is whether "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

■ Evaluating the evidence adduced at trial in the light most favorable to the Government, we hold that the evidence is sufficient to sustain both Sorrells' and Bartley's conviction for conspiracy to deal in unlawful firearms as well as Sorrells' conviction for various substantive violations of the Firearms Act. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Ramos,* 666 F.2d 469, 475 (11th Cir.1982). To sustain the conspiracy convictions, the evidence must show beyond a reasonable doubt that a conspiracy existed, that Sorrells and Bartley knew of its existence, and that they willfully joined the conspiracy with the intent to advance or further some objective of the conspiracy. *United States v. Bland,* 653 F.2d 989, 996 (5th Cir.1981), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.1979) (en banc), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

The evidence sufficiently established the existence of Sorrells' and Bartley's knowledge of an agreement to deal in unregistered firearms. In a meeting, on January 16,

1981, co-conspirator Uttall introduced Sorrells to Peacock as one of his assistants in the conversion project. At this meeting, Sorrells sold Peacock a fully-automatic rifle for $300. From the early stages of Peacock's involvement with Uttall, Sorrells and Bartley were clearly aware of Peacock's intention to buy weapons for export. In numerous conversations with Peacock, Bartley discussed plans to manufacture silencers, noting that Uttall financed his work on the project and stressing that he wanted Peacock to front the money directly to him, rather than going through Uttall. At Uttall's shop, Sorrells explained to Peacock how to detonate a pipe bomb and offered to design and supply bombs at Peacock's request. Sorrells also stated that such devices could be constructed from materials purchased over the counter. In a January 21, 1981, telephone conversation, Sorrells informed Peacock that he was converting an RPB brand and a UZI firearm to fully-automatic. Sorrells further stated that he had worked with Bartley and Uttall on the conversion of the Charter Arms pistol. During this conversation, Sorrells also expressed his desire to deal directly with Peacock, thus avoiding Uttall as an intermediary. In the conversations with Peacock that followed, Sorrells further explained the conversion process and reported on his efforts to complete the assignment.

Sorrells' offer to design and provide bombs for whatever purposes Peacock desired undermines his assertion that he did not know the various items with which he dealt were unregistered. Similarly, Bartley's expression of concern that Uttall's phone might be tapped undermines any assertion of lack of knowledge of an illegal objective. Sorrells' and Bartley's claims of reliance on Uttall to register the weapons are belied by their efforts to circumvent Uttall and deal directly with Peacock. In sum, the record contains substantial evidence that an agreement existed between Uttall, Bartley, and Sorrells to deal in unlawful firearms.

As for the substantive offenses, we find the evidence sufficient to support Sorrells' conviction on eight counts of possessing, transferring, causing the transfer, and aiding and abetting the possessing and transferring of unregistered weapons. Counts X and XI charged Sorrells with possession and transfer of an unregistered Charter Arms firearm on or about January 19, 1981. The evidence reveals that on that date, Sorrells, Uttall, and Peacock met and discussed the Charter Arms firearm which had been converted to fully-automatic. Further, Sorrells testified that the Charter Arms pistol was in Uttall's car. This evidence supports the jury's conclusion that on or about January 19, 1981, Sorrells actually or constructively possessed the firearm, that he aided and abetted in causing its transfer to Peacock, and that he aided and abetted Uttall's possession of the firearm.

Counts XIV and XV charged Sorrells with possession and transfer of an unregistered RPB machine gun on January 22, 1981. At a meeting on this date, Sorrells explained how he had converted the RPB machine gun to fully automatic. Immediately after the meeting, Uttall removed an RPB firearm from his car and gave it to Peacock. Prior to this meeting, Sorrells had informed Peacock in a telephone conversation that he was converting an RPB machine gun to fully-automatic and that it should be available on January 22. Sorrells testified that he had worked on two RPB firearms, both of which had been in his possession and one of which was later converted into an assassination kit. This evidence similarly supports the jury's conclusion that Sorrells actually or constructively possessed the RPB machine gun on January 22, 1981, and that he aided and abetted its transfer to Peacock.

Counts XVI and XVII charged Sorrells with the possession and transfer of an unregistered RPB machine gun mounted in a briefcase. At the January 22 meeting, Sorrells told Peacock he would have no problem with the "assassination kit" because his tests disclosed that the firearm performed satisfactorily. Sorrells had earlier admitted in a telephone conversation that he had converted two RPB's to fully-automatic,

and that one was to become part of an assassination kit.

With regard to the UZI machine gun, Uttall told Peacock on January 17, 1981, that Sorrells was converting an UZI to fully-automatic. On January 22, noting that the UZI was more difficult to convert than the RPB machine gun, Sorrells told Peacock that he had finished the conversion. At the January 30, meeting at the Ft. Lauderdale airport, Uttall and Peacock went to Uttall's car where Uttall transferred to Peacock an RPB machine gun, an UZI machine gun, two .22 caliber silencers, and several pistols. Again, we find that the evidence supports the jury's conclusion that Sorrells possessed, either actually or constructively, the RPB and UZI firearms, and that he aided and abetted their transfer to Peacock on January 30, 1981.

The February 5, meeting at the Ft. Lauderdale airport provides the basis for Count XIX charging Sorrells with possession of thirteen unregistered silencers and an unregistered sawed-off shotgun. Prior to Sorrells' arrest, he had been in the back seat of Goelet's car with numerous firearms, including the sawed-off shotgun, the silencers, and boxes of ammunition. Sufficient evidence exists to support Sorrells' conviction for possession of these firearms.

■ Sorrells' contention that the Government must prove actual knowledge of non-registration to prosecute successfully under 26 U.S.C.A. § 5861(d) is without merit. The statute prohibits the reception or possession of unregistered firearms; knowledge of non-registration is not required. *United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971); *United States v. Sedigh,* 658 F.2d 1010, 1012 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). To sustain a conviction for reception or possession of an unregistered firearm under § 5861(d), or unlawful transfer under § 5861(e), the prosecution need only prove knowledge that the instrument was a firearm. *Freed,* 401 U.S. at 607, 91 S.Ct. at 1117; *United States v. Moschetta,* 673 F.2d 96, 100 (5th Cir. Unit B 1982).

Because we find the evidence sufficient to support a conclusion that Sorrells and Bartley agreed to aid Uttall in the transfer of unregistered weapons, we sustain their convictions on the conspiracy count. With respect to the substantive counts challenged by Sorrells, abundant evidence warrants the conclusion that Sorrells actually and constructively possessed various instruments he knew to be firearms and aided and abetted Uttall in unlawfully transferring those automatic weapons.

### III. REQUESTED JURY INSTRUCTIONS

Sorrells asserts that the trial court committed reversible error in refusing to deliver his requested "theory of defense" instruction. We disagree. As noted earlier, the defense sought to show Sorrells' lack of knowledge that the firearms were unregistered and a lack of knowledge of any illegal agreement. Sorrells asserted that he was incapable of knowingly conspiring or aiding and abetting the underlying substantive offenses.

■ The instruction to the jury followed the pattern instructions for conspiracy and aiding and abetting. In reviewing a challenge to the adequacy of a given instruction, an appellate court must examine the entire charge and determine whether the charge as a whole fairly and correctly reflects the issues and the law. *United States v. Bosby,* 675 F.2d 1174, 1184 n. 17 (11th Cir.1982). In assessing an appellant's claim, the trial court must be given broad discretion in wording the jury instructions and will not be reversed so long as the charge correctly states the substance of the law. *Cain v. United States,* 274 F.2d 598 (5th Cir.1959), *cert. denied,* 362 U.S. 952, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960).

■ Appellant Sorrells requested an instruction involving his lack of knowledge that the firearms he was converting were unregistered. This request would have misstated the law and would only mislead and confuse the jury. The only knowledge element required to be proven is that the

weapons were firearms within the meaning of the statute. *United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971); *United States v. Moschetta,* 673 F.2d 96 (5th Cir. Unit B 1982). A trial judge is not obligated to give a requested instruction that misstates the law or that has been adequately covered by other instructions. *Pass v. Firestone Tire & Rubber Co.,* 242 F.2d 914, 920 (5th Cir.1957).

We find no error in the trial court's instruction. The court sufficiently instructed the jury on Sorrells' theory of defense. It is not the court's responsibility to argue a theory of defense in the instruction. Counsel had that opportunity throughout the trial and he utilized it well. It is clear from the jury's verdict that the argument was simply not sufficiently persuasive. The district court's instructions correctly stated the issues and the law applicable to this case.

As to all defendants we

AFFIRM.