**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Milton BADIA, a/k/a "El Americano",
a/k/a "Milton Vadis",
Defendant-Appellant.**

No. 86–5625.

United States Court of Appeals,
Eleventh Circuit.

Sept. 21, 1987.

William A. Meadows, Jr., South Miami, Fla., George T. Pallas, Miami, Fla. (Co-counsel for oral argument only), for defendant-appellant.

Leon B. Kellner, U.S. Atty., and Frederick Mann, Daniel S. Gelber and Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHNSON and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.

CLARK, Circuit Judge:

Milton Badia appeals his conviction for conspiracy to manufacture firearms without the approval of the Secretary of the Treasury or his delegate, as required by 26 U.S.C. § 5822, in violation of 26 U.S.C. §§ 5861(f), 5871 (1982). Appellant argues before this court that the district court should have (1) suppressed evidence derived from the electronic surveillance of his co-defendant, (2) permitted him to proceed with his defense of CIA involvement; (3) granted his motions for severance; (4) granted his motions acquittal because the evidence was insufficient to support a guilty verdict. Finding no merit to any of these contentions, we affirm.

In 1984, Badia was charged with participation in a conspiracy to manufacture ma-

chine guns and silencers without the requisite approval of the Secretary of the Treasury, and to possess unregistered firearms, in one count of a multi-count superseding indictment. The same indictment charged Eduardo Arocena with the conspiracy count and eighteen substantive counts for possession of unregistered and improperly identified firearms.

Badia's arrest stemmed from a federal investigation of the militant anti-Castro organization known as "Omega–7" which began in 1981. The activities of Omega–7 were directed towards the overthrow of the Castro government. Record, Vol. 13 at 96–98, Record, Vol. 19 at 101–02. During the investigation, Arocena admitted that he was the leader of the group and described its organization. Record, Vol. 12 at 82.

In September, 1981, the government obtained an order to conduct electronic surveillance of Arocena's telephone pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.* (1982) (FISA). The surveillance lasted until October, 1982. Conversations between Arocena and Badia that took place during the surveillance were recorded, and three were admitted into evidence and played at trial. Record, Vol. 17 at 70 (Dec. 16, 1981); Record, Vol. 18 at 93 (Dec. 28, 1981); Record, Vol. 20 at 8 (Jan. 5, 1982). On December 16, 1981, Arocena contacted Badia to arrange meetings between the two men. Record, Vol. 17 at 70; Government's Exh. 3048. In a subsequent conversation on December 28, 1981, Badia and Arocena discussed in code the sale of machine guns and silencers. *See* Record, Vol. 20 at 18, 34; Government's Exh. 3050. Badia offered to manufacture or convert the weapons that Arocena required, Record, Vol. 20 at 20–31, and acknowledged that he had already ordered the manufacture of certain firearms for Arocena. Record, Vol. 20 at 33–34. Badia also explained his pricing structure and delivery method. On January 5, 1985, Badia contacted Arocena to tell him that the firearms were ready. Subsequently, Arocena's agent picked up three cardboard boxes filled with weapons and military paraphernalia from Badia's office for delivery to Arocena. Record, Vol. 19 at 115–16.

After Arocena's arrest, agents discovered various weapons in his apartment and an address book containing Badia's name. Search of a storage space rented by Arocena yielded, among weapons and guerilla gear, a box marked "Badia" that contained gun powder fuses. Record, Vol. 15 at 24–29.

Agents arrested Badia on September 24, 1984 and advised him of his constitutional rights. When the agents told Badia about the incriminating surveillance, he bemoaned that he had told Omega–7 members not to talk to him on the telephone. Record, Vol. 18 at 181. When asked why he had used the telephone himself, Badia responded "[w]ell, I am crazy. I am expected to do things like that."

On November 8, 1984, Badia moved to sever his case from the charges pending against Arocena. The magistrate denied the motion. Badia renewed the motion before the district court, and it was again denied. However, the district court issued several cautionary instructions to the jury that stressed the separate nature of the evidence as it related to each defendant. *See, e.g.,* Record, Vol. 12 at 87–88; Vol. 19 at 120–1.

On November 26, 1984, Badia moved to suppress the wire intercepts obtained by the government pursuant to the electronic surveillance instituted under FISA. The government requested the court to determine the legality of the surveillance. The district court conducted an *in camera, ex parte* review of the documents relating to the application and authorization for the wiretap, and denied the motion. The documents were not released to Badia on the basis of an affidavit submitted by the Attorney General that stated disclosure would endanger national security. Record, Vol. 2 at Tab 65 (Attachment 1).

On December 20, 1984, the government, believing that Badia might attempt to as-

sert a defense of Central Intelligence Agency (CIA) involvement, moved to prevent Badia from examining witnesses about matters not noticed pursuant to the Classified Information Procedures Act (CIPA) 18 U.S.C. App. III (1982). Record, Vol. 2 at Tab 52. Shortly before trial began, the district court barred Badia from introducing classified information at trial for failure to comply with CIPA. Record, Vol. 10 at 45.

Trial commenced on January 29, 1985. Twice during trial, Badia moved for mistrial. Badia made his first motion after a juror expressed concern for his family's safety. The district court dismissed the juror and denied the motion. Badia moved again for mistrial after jurors heard a witness testify, in Spanish, that Badia had contracted to have him killed. The interpreter did not translate the statement, and only the four jurors who understood Spanish understood the statement. The district court struck the statement, issued a curative charge, and polled each affected juror before denying Badia's motion for mistrial. Record, Vol. 19 at 140–44.

The district court denied Badia's motions for acquittal, made at the close of the government's case and again at the close of all evidence. On February 12, 1985, the jury found both Badia and Arocena guilty of the counts charged in the indictment. The district court denied Badia's post-trial motions for judgment of acquittal and for a new trial.

We address each of Badia's contentions on appeal separately, and find that none warrant a reversal.

## I. MOTION TO SUPPRESS

Badia seeks to suppress the wire intercepts on the ground that the surveillance was illegal. Badia claims that the application for the order approving the surveillance was deficient and that approval should therefore not have been granted. Specifically, Badia believes that the surveillance was imposed not to seek foreign intelligence information, but to conduct a criminal investigation. Badia requests this court to review the classified documents to determine whether the government complied with the requirements of FISA. Badia also seeks disclosure of the contents of the FISA application, asserting that continued nondisclosure of an application filed in 1981 is excessive. We disagree with Badia's contentions that the requirements of FISA were not met, and that the application should be made available to him.

Enacted in 1978, FISA permits a federal officer acting on behalf of the President, through the Attorney General, to obtain from a judge or the specially created FISA court, see 50 U.S.C. § 1803, an order "approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information." Id. § 1802(b). FISA contains several definitions of "foreign power" and "agent of a foreign power" pertinent to this case. "Foreign power" includes "a group engaged in international terrorism or activities in preparation therefore." Id. § 1801(a)(4). "International terrorism" means "activities that

(1) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State;

(2) appear to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by assassination or kidnapping; and

(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

*Id.* § 1801(c). The final definition relevant to this case involves "foreign intelligence information," which consists, in part, of

(1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service of network of a foreign power or by an agent of a foreign power;

*Id.* § 1801(e).

The FISA judge is authorized to enter an order approving surveillance if he finds that (1) the applying federal officer has obtained the required authorization and has submitted the required information, *id.* § 1805(a)(1), (2) and (5); (2)

on the basis of the facts submitted by the applicant there is probable cause to believe that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

*id.* § 1805(a)(3); and, (3) the proposed minimization procedures are adequate, *id.* § 1805(a)(4); *see United States v. Duggan,* 743 F.2d 59, 70 (2d Cir.1984).[1]

An application for a FISA order must contain certification by a designated official of the executive branch that the purpose of the surveillance is to secure foreign intelligence information. *Id.* § 1804(a)(7)(B). The application must also include a statement of the basis for believing that the "information sought is the type of foreign intelligence information designated; and such information cannot reasonably be obtained by normal investigative techniques." *Id.* § 1804(a)(7)(E). Once the certification is made, it is subjected only to minimal scrutiny by the courts. *Duggan,* 743 F.2d at 77. Congress intended the reviewing court to have no greater authority to review the executive branch's certifications than has the FISA judge:

in determining the legality of a surveillance ... the trial judge ... [is] not to make determinations which the issuing judge is not authorized to make. Where the bill specifies the scope or nature of judicial review in the consideration of an application, any review under these subsections is similarly constrained. For example, when reviewing the certifications required by [§ 1804(a)(7)], unless there is a prima facie showing of a fraudulent statement by a certifying officer, procedural regularity is the only determination to be made if a non-U.S. person is the target....

H.R. Rep. 1283, 95th Cong., 2d Sess., pt. 1, 25, 92–93 (1978); *Duggan,* 743 F.2d at 77. With this in mind, we turn to the merits of Badia's claim regarding alleged deficiencies in the application and order.

The court has made an *in camera* inspection of the submissions to the FISA judge. A special agent of the Federal Bureau of Investigation (FBI) executed a 23–page affidavit, which served as basis for the application. A federal official, acting as attorney for the applicant, the Department of Justice, completed and signed the application. The Attorney General of the United States approved the application, which was accompanied by a certification executed by the Director of the FBI.[2]

---

1. There are additional requirements if the target of the surveillance is a United States person.

2. *See* 50 U.S.C. § 1805(a)(5). However, it is not disputed that Arocena is a Cuban citizen.

The contents of the application and the certification demonstrate beyond any doubt that Omega–7 was a group engaged in international terrorism as defined by § 1801(a)(4) of FISA. The documents show clearly that Arocena was an agent of a foreign power as defined by § 1801(b)(2)(C). Specific facts in the application establish that Arocena had participated in terrorist acts on behalf of Omega–7, and had been actively engaged in international terrorism prior to the date of the publication for surveillance. Furthermore, the documents establish that the telephone surveillance of Arocena did not have as its purpose the primary objective of investigating a criminal act. Rather, surveillance was sought for the valid purpose of acquiring foreign intelligence information, as defined by § 1801(e)(1). We point out that an otherwise valid FISA surveillance is not tainted because the government may later use the information obtained as evidence in a criminal trial. *See Duggan*, 743 F.2d at 78. Indeed, FISA contemplates such use.[2] *Id.* § 1806(b).

Badia also seeks disclosure of the FISA application, ostensibly so that he may review it for errors. We cannot grant this request. Where the Attorney General files an "affidavit under oath, that disclosure or an adversary hearing would harm the national security of the United States," section 1806(b) of FISA provides for *in camera, ex parte* review of the application by the court. The Attorney General filed such an affidavit in this case and the district court followed the proper procedure. By statute, the district court may disclose portions of the application or other materials to the aggrieved person only where necessary to make an accurate determination of the legality of the surveillance. *Id.* § 1806(f). In this case, the district court

was able to determine the legality of the surveillance without disclosing the contents of the application. Having reviewed the contents of the application, we find that the district court did not abuse its discretion.

We conclude that the Attorney General was fully justified in applying for and securing surveillance of Arocena's telephone. The government has fully complied with all of the requirements under FISA. Thus, Badia's motion to suppress the evidence obtained from the surveillance was appropriately denied by the district court. Furthermore, we find no reason to disturb the district court's determination that the contents of the FISA application need not be disclosed in order to assess its legality.

## II. DEFENSE OF CIA INVOLVEMENT

Badia argues that the district court should have allowed him to assert a defense of CIA involvement, which would have demonstrated that the government approved the operations in which he was involved. However, Badia failed to comply with § 5 of the Classified Information Procedures Act, 18 U.S.C. App. III (1982) (CIPA), which requires a defendant who intends to disclose classified information to give written notice of his intention to the court and to the United States at least thirty days before trial, and to include a brief description of the information involved. Badia failed to provide notice,[3] despite the fact that the government informed him twice of the thirty-day deadline. Badia has not demonstrated any reasonable excuse for his noncompliance.

Under § 5(a) of CIPA, a defendant who reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding involving

---

2. Congress even suggested that where the surveillance yielded conclusive evidence of a crime, it "may be extended longer where protective measures other than arrest and prosecution are more appropriate." S.Rep. 701, 95th Cong. 2d Sess. 11 *reprinted in* 1978 U.S.Cong. & Admin.News 3973, 3980 (footnote omitted).

3. On December 11, 1984, after the deadline had passed, Badia filed a motion to declare CIPA unconstitutional. Badia does not raise this issue on appeal.

the criminal prosecution of such defendant, the defendant shall, within the time specified by the court or, where no time is specified, within thirty days prior to trial, notify the attorney for the United States and the court in writing. Such notice shall include a brief description of the classified information.... No defendant shall disclose any information known or believed to be classified in connection with a trial or pretrial proceeding until notice has been given under this subsection and until the United States has been afforded a reasonable opportunity to seek a determination pursuant to the procedure set forth in section 6 of this Act, and until the time for the United States to appeal such determination under section 7 has expired or any appeal under section 7 by the United States is decided.

The sanction for failure to comply with the requirements of subsection (a) is that "the court may preclude disclosure of any classified information not made the subject of notification and may prohibit the examination by the defendant of any witness with respect to any such information." *Id.* § 5(b) This court discussed the purpose of CIPA and the importance of its notice requirement in *United States v. Collins*, 720 F.2d 1195, 1197 (11th Cir.1983). The objective of CIPA is "to.... provide procedures under which the government may be made aware, prior to trial, of the classified information, if any, which will be compromised by the prosecution. To that end, the defendant who reasonably expects that his or her defense will result in the disclosure of classified information is required, to assure admissibility of such information at trial, to give the court and the government prior notice of the classified information deemed involved." *Id.* Notice is necessary to permit the government to choose an alternative course that minimizes the threat to national security. *Id.* The government then may seek a ruling that some or all of the information is not material, move that a non-sensitive summary of the classified information be substituted for the material,

or admit a controverted fact sought to be proved by the classified information. *See* § 6(a) & (c); *id.* Obviously, without sufficient notice that sets forth with specificity the classified information that the defendant reasonably believes necessary to his defense, the government is unable to weigh the costs of, or consider alternatives to, disclosure.

Badia presents several reasons to justify his failure to provide the requisite notice. First, Badia argues that the government was aware that he intended to assert a CIA defense. Otherwise, he contends, it would not have sought to preclude him from examining witnesses on matters not noticed pursuant to CIPA. Badia also maintains that his response to the government's notice provided additional notice of his intention to assert this defense.

■ We reject this claim outright because it ignores the purpose behind enactment of CIPA, and its specific guidelines and sanctions. As discussed above, the objective of CIPA is to provide the government with both notice of the defendant's intent to introduce sensitive information at trial, *and a particularized description of the classified information prior to trial.* The government's belief that a defendant may assert a defense involving classified material cannot substitute for the formal notice mandated by § 5(a). The thirty-day time frame is intended to give the government the opportunity to ascertain the potential harm to national security, and to consider various means of minimizing the cost of disclosure. Any form of notice provided less than thirty days prior to trial clearly does not permit the government to accomplish this objective.

Badia also argues that the district court should have held a hearing to determine whether his examination of witnesses would result in the disclosure of classified information. Badia alleges that his defense would have been that he lacked *mens rea* because he was involved in what he believed to be an operation sanctioned by the United States government. He con-

tends that the government could have rebutted this claim simply by presenting evidence that he had not been working with the CIA (or, presumably, another government agency).

■ We find no merit to Badia's contention that his desire to examine witnesses at trial about CIA operations and methods would not fall within the scope of CIPA. Section 5(a) requires notice when a defendant reasonably expects to disclose classified information in any manner during trial. Clearly, Badia was required to provide formal notice of his intention to assert a defense of CIA involvement. Furthermore, Badia's claim that the district court should have conducted a hearing on this issue prior to its ruling is without merit. Such action would have sanctioned his failure to comply with the notice requirement of CIPA. We note that CIPA requires the district court to conduct a hearing only in specific situations, none of which apply here. *See* § 6.

Badia failed to comply with the explicit provision of CIPA and has demonstrated no reason to justify his noncompliance. Accordingly, we find no error in the district court's ruling that he is precluded from raising matters at trial that should have been noticed pursuant to CIPA.

### III. MOTIONS FOR SEVERANCE

Badia contends that the district court erred in denying his motions for severance. Both Badia and Arocena were charged with conspiracy to manufacture and to alter firearms without the requisite approval of the Secretary of the Treasury on the basis of several overt acts. Arocena was also charged with eighteen substantive counts involving possession of unregistered firearms. Badia alleges prejudice due to a "spillover" effect from Arocena's "notoriety" and testimony regarding Arocena's actions, which included involvement in the vandalism of two pharmacies, a clandestine meeting, preparation of a "target list," and the possession of various weapons.

■ To prevail, Badia must prove that the district court abused its discretion in denying severance. *See, e.g., United States v. Van Horn,* 789 F.2d 1492, 1505 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986). To establish an abuse of discretion, "the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection." *Id.* (citation omitted). Persons indicted together should ordinarily be tried together. *Id.* This preference is based on the desire to avoid multiple litigation and to conserve judicial resources. *United States v. Butler,* 792 F.2d 1528, 1534 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). Of course, inherent in every joint trial is some degree of bias. *Id.* Nevertheless, severance should only be granted when the jury could not make an individualized determination as to each defendant's culpability, and render a fair and impartial verdict. *Id.* Badia has failed to meet this stringent burden.

■ The indictment alleged fifteen overt acts, twelve of which involved Badia and Arocena, and three of which referred only to Badia. Joinder of defendants is appropriate where the indictment contains a single conspiracy that has been charged in good faith. *United States v. Butera,* 677 F.2d 1376, 1384 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). In addition, the allegedly prejudicial testimony pertained primarily to the substantive counts with which only Arocena was charged. Most of the testimony had little connection to the conspiracy count, which was the only charge pending against Badia. Furthermore, on several occasions, the district court admonished the jury to consider the evidence only against Arocena. Absent evidence to the contrary, we presume that the jury was able to follow the court's instructions and evaluate the evidence against each defendant independently. Thus, Badia has failed

to demonstrate that the jury was unable to make an individualized determination as to each defendant, and that as a result he suffered specific, compelling prejudice. The district court did not abuse its discretion in denying Badia's motions for severance.

## IV. MOTION FOR MISTRIAL

 Badia claims that on two separate occasions jurors were exposed to irrelevant evidence that prejudiced his right to a fair and impartial trial. It is established that "[d]eterminations of the impact of allegedly prejudicial testimony upon a jury as well as what curative measures, if any, can be taken to negate the harmful effects, are matters within the sound discretion of the trial judge." *United States v. Rouco*, 765 F.2d 983, 992 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986) (citation omitted). Furthermore, "[p]rejudicial testimony is less likely to mandate a mistrial 'when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury.'" *Id.* (citation omitted). Badia has failed to persuade us that the district court abused its discretion by denying his motions for mistrial.

Badia first sought a mistrial after the government circulated a target list among the jurors,[4] and one juror expressed fear. Badia also moved for a mistrial after a government witness testified, in Spanish, that Badia had wanted him killed. In both situations, the district court took immediate remedial steps. After the government introduced the target list as evidence, the district court granted the defendants' joint motion to dismiss the juror. Record, Vol. 14 at 88–90. In the second instance, the district court immediately separated the four affected jurors and instructed them as follows:

THE COURT: Now, ladies and gentlemen, did you understand what was said by [the witness] that was not translated? Did each of you understand that?

THE JURORS: Sure.

THE COURT: First, I am going to strike that testimony from the Record. I am going to ask you not to consider that in either case, but particularly in the case against Mr. Badia. Can you do that?

Can each of you do that? You said that was an unresponsive question. It was an unresponsive answer, I should say. It was really an emotional response that was not called for by the question.

Now, I want to make sure that each of you can continue to try this case fairly and impartially and disregard that particular statement.

[Court polls each juror individually]

THE COURT: Can you put that out of your mind and give both of the Defendants a completely fair trial, disregarding the statement that has just been made? Can each of you do that?

[Court polls each juror individually]

[Court repeats question and again polls each juror individually]

THE COURT: Now, may I ask that you, please, not discuss your understanding of what was said with any of the jurors who do not understand Spanish. Please do not discuss that at all.

Record, Vol. 19 at 140–42. The court polled the jurors separately three times, issued two cautionary instructions, and struck the testimony from the record. Thus, in both instances, any potential prejudice was mitigated as quickly and effectively as possible.

We note the similarity between Badia's argument and the one rejected by this

---

**4.** The "target list," found in Arocena's apartment, which Badia refers to on appeal as a "hit list," contained the addresses of businesses, including two pharmacies that Omega–7 allegedly vandalized. It was introduced to show that Arocena possessed certain weapons, received from Badia, that Omega–7 had used to vandalize the pharmacies. Record, Vol. 14 at 76–77.

court in *Rouco*, 765 F.2d 983. Rouco also sought a mistrial after a government witness testified, in Spanish, that he had been willing to kill someone. In that case, the court polled each affected juror. The three jurors who heard and understood the remark stated that they could disregard it, and promised not to mention it to other jurors. The court concluded that, on the basis of the strength of the evidence, the relatively small number of jurors who heard the remark, and the district court's curative action, the district court did not abuse its discretion in refusing to grant a mistrial. *Id.* at 992.

We reach the same conclusion in the case before us on the basis of the strength of the overwhelming evidence against Badia, *see* Section V, the small number of affected jurors, and the district court's prompt remedial action. We conclude that the district court properly denied both of Badia's motions for mistrial.

## V. SUFFICIENCY OF THE EVIDENCE

Badia contends that the evidence is wholly insufficient to sustain a guilty verdict on the conspiracy charge because it fails to show an agreement to commit an unlawful act, or an overt act by him in furtherance of the conspiracy. Badia admits three conversations with Arocena regarding his "ability to provide various weapons and other equipment," Appellant's Brief at 22, but claims that he did not conspire to commit an unlawful act because he believed that the weapons were destined for use in Nicaragua. Badia asserts that no evidence proved that he knew Arocena would convert the weapons (to automatic) and assemble silencers for use within the United States. Badia also claims that there is no evidence linking the weapons he sold to Arocena with the ones found in Arocena's possession at the time of his arrest nineteen months later, or the weapons used to vandalize the pharmacies. Thus, he asserts that there is no evidence to show that he knowingly participated in a plan to manufacture or convert illegal weapons.

On appeal, we review the evidence in the light most favorable to the government. *United States v. Johnson*, 713 F.2d 654, 661 (11th Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). In assessing the sufficiency of the evidence, our review is limited to a determination of whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt. *Id.* It is well established that to support a conviction of conspiracy, the government must demonstrate that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily participated in the conspiracy. *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983). The existence of the agreement may be proven by circumstantial evidence. *See id.*

The evidence in this case establishes beyond a doubt the existence of a conspiracy to manufacture or possess unregistered firearms. Through the introduction of the recorded telephone conversations between Badia and Arocena, and the testimony of numerous witnesses, the jury had the opportunity to assess the evidence against Badia. The evidence clearly shows that the overt acts alleged in the indictment, e.g., the substance of the telephone conversations between Badia and Arocena, took place. During the telephone conversations, the two men discussed manufacturing or converting weapons to meet Arocena's needs. Record, Vol. 20 at 26–31. Badia claimed that he could acquire any type of weapon Arocena required simply by calling his workshop. *Id.* at 20–21. Subsequently, Badia telephoned Arocena to tell him that the requested parts were ready for delivery. Furthermore, Badia's concern that Arocena's phone had been tapped undermines his contention that he had not participated in illegal activity. *See United States v. Sorrells*, 714 F.2d 1522, 1530 (11th Cir.1983). Thus, Badia's own statements and conduct demonstrate beyond a reasonable doubt that he knew that the weapons and parts he offered to provide to Arocena were in contravention of the law.

■ Badia's claim that he did not participate in unlawful activity because he did not know that the arms would be used in the United States is both irrelevant and ridiculous. The conspiracy conviction is based on an agreement to manufacture and upgrade weapons without the approval of the Secretary of the Treasury; it is not contingent on the ultimate destination of the weapons.

There is more than sufficient evidence upon which to sustain Badia's conviction for conspiracy to manufacture or possess illegal arms. A reasonable jury could indeed find that the evidence against Badia established guilt beyond a reasonable doubt.

For the reasons expressed in this opinion, the appellant's conviction is

AFFIRMED.